

**NUMBER 13-12-00173-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**ELOY JIOVANNI PEREZ**
**ALCALA,**                                                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                             **Appellee.**

### On appeal from the 332nd District Court
### of Hidalgo County, Texas.

# OPINION

### Before Justices Benavides, Perkes and Longoria
### Opinion by Justice Longoria

A jury found Eloy Jiovanni Perez Alcala guilty of capital murder involving a double-homicide, and because the State did not seek the death penalty, the trial court assessed a life sentence.  *See* TEX. PENAL CODE ANN. § 12.31(a)(2) (West 2011); *id.* §

19.03(a)(7)(A) (West Supp. 2011).  Alcala now appeals his conviction by four issues, which we have reordered as follows:  (1) the evidence is insufficient to support his conviction because the State failed to establish that he shot either of the victims or that he was a party to the capital murder; (2) the trial court erred in admitting the hearsay testimony of David Garza; (3) the trial court violated Alcala's Sixth Amendment right to confront and cross-examine witnesses by admitting hearsay statements through the testimony of David Garza; and (4) the trial court erred in allowing Janie Arrellano of the Pharr Police Department to testify as an expert.  For the reasons set forth below, we affirm the judgment of the trial court.

## I. BACKGROUND

At trial, the State offered physical evidence and the testimony of a number of different witnesses in support of its case.  These witnesses included police officers, investigators, eyewitnesses, and experts.  The following evidence and testimony are relevant to the issues raised by Alcala in this appeal.  *See* TEX. R. APP. P. 47.1.

### A. Officer Enrique Ontiveros

At approximately 1:30 a.m. on October 8, 2010, Officer Enrique Ontiveros of the City of Pharr Police Department was in his police cruiser patrolling an area of the city known as "Las Milpas."  He had the windows down when he heard what sounded like three gunshots.  He radioed the police dispatcher to ask if there had been any reports of gunshots heard in the area of the 500 block of Dicker Road.  The dispatcher responded, "Negative."  Officer Ontiveros then advised the dispatcher that he was going to investigate the gunshots he heard.  While he was en route, a "hot call" or emergency call went out over the radio advising all patrol officers of reports of "gunshots and two

2

men down" at the intersection of Santa Monica Street and Sabino Avenue, located in a small subdivision northeast of Officer Ontiveros's position. Officer Ontiveros turned north onto Laurel Street, then east onto Santa Monica Street, and proceeded toward the intersection with Sabino Avenue.

The police cruiser in which Officer Ontiveros was travelling was equipped with a dashboard video camera ("dash-cam") that was activated when Officer Ontiveros turned on his vehicle's police sirens. The dash-cam was wirelessly connected to a microphone Officer Ontiveros was wearing that night. At trial, the video from the dash-cam was played for the jury. As Officer Ontiveros was approaching the scene of the crime, the dash-cam captured an image of what appeared to be a white Dodge truck parked on the side of the road on the 700 block of Santa Monica Street, about two blocks away from the scene of the crime. Although he had no reason to know it at the time, the white Dodge truck was about to become the focus of an intense police investigation and manhunt.

Officer Ontiveros was the first officer to arrive at the scene. When he arrived, he discovered "two bodies," "two men down." One body was "right in front" of a brown minivan that was parked by a stop sign at the intersection. The van's headlights were on, and the engine appeared to be running. The second body was also near the van. Both men appeared to have sustained fatal gunshot wounds to the head.

Officer Ontiveros called for backup. Then, he walked over to 901 Santa Monica Street, a house "right in front of . . . where" he discovered the lifeless bodies of the two men—later identified as David Garcia and Victor de la Cruz. He "spoke to the resident owners there," a husband and wife. The husband, Arturo Arredondo, told him that he

3

was asleep in bed when his wife woke him up to tell him that there were some people arguing outside in the street. Then, he heard the gunshots. He went outside and "saw a white truck leaving [the] location." It was a four-door Dodge truck. Officer Ontiveros asked Arredondo how he knew it was a Dodge truck, and "he said because he got to observe the Dodge emblem on the tailgate." At that point, Officer Ontiveros radioed dispatch and reported Arredondo's description of the suspect's vehicle.[1]

Officer Ontiveros also spoke to "several [other] witnesses [who were] around that area." Two men who were also standing outside reported that they were inside their residence when they heard gunshots. "[T]hey came out and that's when they saw the two bodies on the ground." "[A]nother lady . . . told . . . [Officer Ontiveros] the same thing[: ] that they just heard the gunshots and then all of a sudden she just saw the emergency vehicles there."

As Officer Ontiveros was securing the scene, a vehicle approached, and he stopped it "because . . . [he] didn't want [any]body to cross through there to where the bodies were . . . ." One of the occupants of the vehicle was a woman named Maricela Garcia. She told Officer Ontiveros that one of the victims was her son. "And so . . . [he] just told the driver, 'Okay. Just stay here behind . . . the scene. Don't come to the scene."

On the dash-cam video, Maricela Garcia is heard saying, "[T]here was a boy there and the boy's father." She continued, "I do not know who they are. I don't know them." Then, she added, "I think one of the boys had fought with him. . . We saw them - - I saw them pass by." After that, an unidentified speaker—possibly, Maricela Garcia—is heard telling Investigator Michael Perez of the Pharr Police Department, "He

---

[1] Arturo Arredondo also testified as a witness for the State at trial.

4

lives right []here … [i]n [sic] the street like the last house over there."[2] Investigator Perez asked, "He lives right there on this street?" And the unidentified speaker answered, "Yes." Then, Investigator Perez is heard saying, "Possible suspect resides here on this street, talking about a white Dodge [truck] as well. And they are the ones that they are saying they were arguing with. They are the same ones."

Shortly thereafter, Investigator Perez is heard summing up what the police knew at that point:

> So they got into . . . a fight. See what happened is that this victim here, the one in the yellow, he was already at home. He had just gotten home from work. . . Right here on Laurel [Street], a female came over to visit him, but that female used to be with the guy that lives at the daycare. She passed by his house, by the suspect . . . at his house. . . And they started fighting. They were fighting along with the father.

"Two lives for a woman," one of the officers remarked. A second officer asked, "Who are these guys?" A third officer answered, "It looks like they were, like, subcontractors or something." Then, reading from a pink receipt recovered from the crime scene, the same officer said, "Matt's Cash & Carry."

## B. Maricela Garcia

The State called Maricela Garcia as a witness. She lives on Laurel Street, near the entrance to the neighborhood and several streets away from where the murders occurred. She testified that on Friday, October 7, 2010, her son, David Garcia, had been working in a field with his cousin, Victor de la Cruz. David left for work early in the morning, and "[t]hey were getting out late . . . [because] he stayed there talking with somebody." Maricela was "laying down watching television," waiting for David to return home. She heard the sound of David's truck approaching, but she "stayed laying down

---

[2] Investigator Michael Perez also testified at trial.

5

to see if he would knock on the door." When she "didn't hear him knock on the door, . . . [she] got up." She did not recall what time it was, but "it was late." She estimated it was "[m]aybe 1:00."

She went outside and saw that David was inside a white car fighting with Alcala. She was familiar with Alcala and identified him in the courtroom. David and Alcala were also familiar with each other. According to Maricela, "They were friends since they were small. They went to school [together] since they were small." "[T]hey would get together. Sometimes [David] … would play - - go play at … [Alcala's] house." Alcala's house was just down the street, at the intersection of Laurel Street and Santa Monica Street.

A neighbor helped Maricela separate the two men. David "was full of blood." Maricela took him inside and "scolded him." She "went ahead and told him, 'If you're friends, why are you fighting?'" David answered, "[I]t was a misunderstanding." Then, he explained that what happened was that "he was coming into the neighborhood when he heard a car honk at him and he thought it was somebody that wanted to fight with him." So then he followed the car until he discovered that the person driving the car was Alcala's girlfriend. At apparently the same time, Alcala emerged from his house and learned what had happened. David apologized to him and "asked him to forgive him because he . . . did not know it was a girl, he thought it was a man." Then, the two men began fighting.

After giving his mother this version of events, David said, "I'll be back," and he went outside, still bleeding from a wound to the forehead. Maricela "told him not to leave," but "[h]e went outside walking . . . by the side of the road." According to

6

Maricela, "that's when . . . [Alcala] drove by and steered the car towards him, . . . driving the car at a high rate of speed." Alcala was in the same car that he was in when the two men had been fighting moments earlier. He then drove off.

About ten minutes later, Alcala returned to Maricela's house, this time with his father. "[T]hey were both angry . . . [and] upset." They were driving a different vehicle, "a white vehicle, [a] Dodge." Alcala asked for David. Maricela said David was not there. Alcala then told Maricela that he knew David had a wife and daughter. He pointed at Maricela's daughter and asked if she was David's wife.[3] Then, Alcala's father asked where Maricela's "husband was, that he wanted to speak to … [her] husband." She "told him that . . . [her] husband was not there, that he was out working." She asked "why they wanted to talk to them." Then, she asked why Alcala "had steered the car towards . . . [David], what if . . . [he] would have killed him." At this point, Alcala told her, "Whether it's today or tomorrow, it's going to be his turn." She told him, "[W]ait, son, maybe for tomorrow because you are upset. I'll take him to your house tomorrow." The men "appeared to be very upset" when they departed.

Maricela stayed outside, "waiting for [her] . . . son to see how he would return." She saw "a van pass[] by with Victor [de la Cruz] and . . . [her] son." The van "went around the neighborhood . . . [, and then] turned back." Maricela testified that, at this point, she was "outside and heard some gunshots." "Immediately . . . [she] thought it was them . . . , that they were fighting." At about the same time she heard the gunshots, she "saw a police officer drive by . . . [and] asked the neighbor to please take . . . [her] because maybe it was them." When they got to the scene of the shooting, David and Victor "were already laying down," dead. She felt like her "soul had ended."

---

[3] Maricela's sister and her neighbor were also outside and witnessed the encounter.

She approached the policeman, Officer Ontiveros, and said that one of the victims "was [her] . . . son."

## C. David Garza

The State also called David Garza as a witness. Garza lives directly across the street from the Alcalas' house. He has known Alcala's father for seventeen to twenty years. Both men were part of the neighborhood watch. The following exchange occurred during his direct examination by the State at trial:

> Q   Let me take you back, sir, to October 8th of 2010 of last year around 1:00 in the morning. What were you doing that evening, sir?
>
> A   We were asleep. And my sister-in-law, she called us and my daughter-in-law answered the phone and she came to our room and says - -
>
> > [Alcala's Attorney]:   Objection, hearsay, Your Honor.
> >
> > The Court:   Overruled at this point. Go ahead sir, go ahead.
>
> A   She says that - - that [Alcala] . . . was outside of my - - on - - front of my yard, on the street that - - yelling that he was going to kill the dog.
>
> > The Court:   Okay. Ask another question please.
> >
> > [The State]:   Yes, sir.
>
> Q   At this point, after gaining this information from your . . . daughter?
>
> A   My daughter-in-law.
>
> Q   Your daughter-in-law. Did she wake you up from your sleep?
>
> A   Yes.
>
> Q   Your daughter-in-law?
>
> A   Yes.

8

Q    So you were asleep at this point, your daughter-in-law gets a phone call, she comes out to you and wakes you up?

A    Right.  We woke up with the telephone.

Q    The telephone woke you up, not your daughter?

A    Yeah - - well, the phone rang and we woke [up], but my daughter-in-law picked up the phone.

Q    Okay.  And after making contact with your daughter-in-law, what did you do after that?

A    I looked out the window because my wife told me that - -

    [Alcala's Attorney]:  Objection again, hearsay, Your Honor.

    The Court:    Well, at this point it's overruled.

A    And I woke up and I looked out the window and - - my window is right in front by the street, and I seen . . . [Alcala] in front of my yard.  And my dog was barking and that's when I went down to see, you know, why he wanted to kill the dog because he was yelling something about killing the dog.

Q    Okay.  So you had a dog outside and he was yelling that he wanted to kill the dog?

A    He said, "*Voy a matar*" - - I don't know how to say it in English, but - -

Q    You can say it in Spanish.

    The Interpreter:    I am going to kill that dog.

    The Court:    Damn dog.

    The Interpreter:    - - damn dog.

Q    And so you heard that?

A    I thought … he was going to kill my dog, right.

Q    But you heard him yell that?

9

A    No.   That's what my sister-in-law was telling me by the phone. When I went down, I thought he was going to kill my dog, because that's what I heard from the phone.

Q    Okay.  After you went downstairs, what did you do?

A    I went downstairs and . . . I went outside, but by the time I got outside, . . . [Alcala] wasn't out there anymore.

Q    Where was he?

A    He - - I seen the truck pulled - - pull out of their house.

Q    Well, you saw which truck?

A    His dad's.

Q    What color is it?

A    It's like a beige, like a beige color.

Q    Beige?

A    Dodge.

Q    Cream?

A    Like a cream, yeah, cream, beige.

Q    Okay.  And it's a Dodge?

A    Right.  It's four door.

Garza then proceeded to testify that he saw the cream or beige colored Dodge truck go down Laurel Street, towards David's house, and that when the truck reached about that area, he saw its brake lights.  Then, the vehicle went dark, and Garza went back inside his house.  He was using the restroom when he heard three gunshots.  He looked outside and saw the white Dodge truck parked by the mailbox in front of Alcala's house. He watched as Alcala exited the truck, approached a second vehicle parked in the driveway, opened and closed the hood of the vehicle, and then disappeared into the

10

house. At this point, a police unit drove by with its emergency lights activated. It was Officer Ontiveros responding to the call, which is when his dash-cam captured the image of the white Dodge truck parked on the side of the road.

After Officer Ontiveros had passed, Alcala's father drove the truck onto his property and into a dark area near a tree. This struck Garza as "odd" because Alcala's father had the vehicle's headlights off when he was moving the truck onto his property. "[I]t was dark, [and] . . . common sense tells you to turn on the light[s] to pull into your driveway so you won't hit your gate or your fence or . . . anything."

Alcala's father was in the process of securing the gate to the fence that surrounded his property when Garza called out to him, "Eloy, what happened?" Alcala's father looked around and then came across the street to Garza's driveway, where the two men met. Garza asked, "Why was [Alcala] . . . yelling?" Alcala's father responded, "Oh, no . . . . [H]e was fighting. He had a fight with somebody and - - but I already took care of that." Garza's wife, who was also outside with the men, interrupted, "But we heard three gunshots." "Really?" he responded. Garza found it "odd" that Alcala's father was acting "like he was surprised" because the gunshots "were loud and it was … quiet." Then, Alcala's father said, "Well, I don't know . . . [,] [b]ut I have to go to work in the morning and I'll see you-all guys later."

Garza explained that this was unusual "[b]ecause when the unit was over there, . . . where we heard the gunshots, he wasn't like interested in seeing what was going on or what had happened, right, over there in that corner." Garza continued, "And it surprised me because, you know, usually we would all go out, you know, [to] see what is going on and he wasn't interested." Instead, Alcala's father went inside the house

11

and turned off all the lights, which was also unusual, according to Garza, because they typically left a light on outside by their storage unit. On this particular night, "everything was off." The house and the lot were both completely darkened.

## D. Officer Juan Manuel Quilantan

Officer Juan Manuel Quilantan of the Pharr Police Department also testified for the State. At approximately 1:30 a.m. on October 8, 2010, he was on patrol when Officer Ontiveros radioed the "dispatcher to see if there were any calls for shots fired." Officer Quilantan immediately "started heading southbound on Cage [Boulevard] towards Las Milpas." When he arrived at the scene of the shooting, several officers had already arrived," including Officer Ontiveros. Officer Quilantan helped "block[] off any oncoming traffic." Then, he "started looking for bullet casings." He found one and marked its location. Another officer recovered a second casing, also marking its location. The third casing was never recovered.

From speaking to Officer Ontiveros, Officer Quilantan learned that the suspect's vehicle was a white Dodge truck and that the suspect lived within about "two blocks" of the crime scene, possibly next to a daycare facility. Officer Quilantan was familiar with Las Milpas because "rookies" in the Pharr Police Department are assigned to "Las Milpas to get to know how to . . . speak to the people . . . and get comfortable with them so when . . . [they] get back to Las Milpas, which is a high crime area, [they] . . . know . . . who to talk to and who not to talk to." From his previous experiences, Officer Quilantan was familiar with the daycare, and it got his attention.

Together with Officer Eric Galaviz and Officer Jose Luengo, both also of the Pharr Police Department, Officer Quilantan set out on foot to locate the suspect's

12

vehicle. The officers initially spotted a white Dodge truck parked on the property located at 7002 Laurel Street. The truck was parked inside a hurricane fence, but the gate to the fence was locked. Officer Quilantan called out, shouting for the people inside to come outside. When no one answered, he got his baton and began "banging it on the gate." A few minutes later, people "started coming out." A woman appeared with her husband and brother-in-law. She said she and her husband were the owners of the property. "After identifying everybody[,] . . . [the officers] ran . . . an inquiry on all three subjects, [and] they came out clean . . . ." Officer Quilantan "touched the hood of the truck[,] . . . [a]nd it was cold like it had not been touched, not been moved."

As Officer Quilantan was preparing to leave the property, "[s]omebody drove up to Officer Galaviz and said, 'That's not the vehicle. The vehicle is over here.'"[4] Officer Quilantan turned to look in the direction where the person had pointed and saw "there was another white Dodge Ram by a tree completely dark." The officers approached the property, which was enclosed by a chain-link fence, and discovered that the gate to the fence was unlocked. The truck "was parked inside the property by the tree, like real close to the tree." The address was "708 or 709 Santa Monica [Street]."

At this point, Officer Jesse Garza of the Pharr Police Department arrived at the scene. Together, he and Officer Quilantan went inside the property and touched the hood of the truck. It "was warm." Then, using a flashlight, Officer Quilantan "spotlighted the inside of the cabin of the truck [and] . . . was able to see . . . a live bullet . . . inside . . . [a] cup holder." Then, Officer Garza said, "Hey, you know what, somebody is looking

---

[4] Although Officer Quilantan did not know it at the time, the person who advised the officers that they were looking at the wrong truck was a member of David Garza's family. After Alcala's father had gone into his house, the Garza family had remained outside watching the investigation. They watched as the officers got sidetracked with the wrong vehicle. They knew the officers "never saw … [the Alcalas'] truck because their truck [was] parked back towards this side. And it was dark."

13

at us." The house "had the lights off, but you could see a silhouette going like - - you know, looking at us," Officer Quilantan testified. He "spotlighted it, [but] that person was no longer there."

Officer Quilantan's attention then shifted to a pearl-colored Cadillac CTS that was also parked on the property, inside the chain-link fence. He "lit it up with [his] … flashlight, [and he] . . . could see a lot of bloodstains." Sergeant David Castillo of the Pharr Police Department opened the door to the vehicle, and the officers "looked at the inside and it was just full of blood." "And then that's when several of [the officers] … decided to do a knock and talk, which is talk to the owners of the residence and see what's going on."

## E. Sergeant Daniel Leal

The State called Sergeant Daniel Leal of the Pharr Police Department as a witness. Sergeant Leal arrived at the crime scene after it had been secured. He spoke to Maricela Garcia and knew that David Garcia had been in a fight earlier in the evening. When he heard Officer Quilantan radio dispatch to report a vehicle matching the description of the suspect's vehicle, he travelled to the 700 block of Santa Monica Street, where he joined the other officers who were in the process of surrounding the Alcalas' home. They knocked on the front door, but initially, no one answered. Finally, Alcala's father came to the door.

Sergeant Leal requested consent to search the Dodge truck, the Cadillac CTS, and the residence. Alcala's father signed a written consent to search, which was admitted into evidence at trial. Then, the officers and investigators entered the house. According to Sergeant Leal, one of the officers asked Alcala's father if he had any

14

weapons in the house, and Alcala's father indicated that there were several weapons in the house. He retrieved a short-barrel rifle from the closet in his bedroom and handed it to Sergeant Leal. Another officer, Lieutenant William Ryan, recovered a nine-millimeter handgun, which Alcala's father voluntarily provided.

## F.  Sergeant David Castillo

The State also called Sergeant David Castillo of the Pharr Police Department to testify as a witness. Sergeant Castillo arrived at the crime scene, and then, he made his way to the Alcalas' home, where the other officers reported finding a vehicle matching the description of the suspect's vehicle. Sergeant Castillo testified that the single round of ammunition found in the cup holder of the white Dodge truck parked on the Alcalas' property was for a .40 caliber handgun. According to Sergeant Castillo, Alcala's father "was asked if he had a .40 caliber handgun and he stated yes." This weapon was later recovered from inside the house. Alcala's father also cooperated with the police by pointing out where additional ammunition and magazines could be found in a backpack in the backseat of the white Dodge truck. Based on the information provided by Alcala's father, Sergeant Castillo was able to locate ammunition and magazines for a .40 caliber handgun and for a rifle.

## G.  Officer Eric Galaviz

The State called Officer Eric Galaviz of the Pharr Police Department to testify as a witness. Officer Galaviz testified that he was with the other officers and investigators when they made contact with Alcala's father at the family's residence. The following exchange occurred on the State's direct examination:

Q      And can you describe that encounter to this jury?

15

A        What . . . I did was I asked the resident owner where his son was at. He said he was in his room, which was on the northwest corner of the residence. Me and Officer Jesse Garza went into that room and made contact with Mr. Alcala, Jr.

I asked him to come out. I believe his girlfriend was in there also. I don't recall her name because I didn't identify her. As soon as we got him out, I did notice that he had a black eye on his - - I believe it was his right eye. He started asking me what was going on. I told him I didn't know, you know, that we are here doing an investigation. And at that point[,] Officer Quilantan read him his rights. . . As soon as he read him his rights, I walked out.

## H. Lieutenant William Ryan

The State called Lieutenant William Ryan of the Pharr Police Department to testify as a witness. Lieutenant Ryan testified that he was present in the Alcalas' home when Alcala's father "passed over" the .40 caliber handgun.

## I. Lieutenant William Thomas Edmundson, Jr.

The State called Lieutenant William Thomas Edmundson, Jr. of the Pharr Police Department to testify as a witness. Lieutenant Edmundson testified about the two shell casings that were recovered from the crime scene. He testified that they were for a .40 caliber weapon. "When [he] … heard that there was a .40 caliber weapon that was recovered at the [Alcalas'] residence, . . . [he thought] [t]hat they probably recovered the murder weapon."

## J. Investigator Janie Arrellano

The State called Investigator Janie Arrellano as a witness. She testified that she is a crime scene investigator employed by the Pharr Police Department. She photographed the scene where the shooting occurred. She also collected physical evidence, including the two spent shell casings recovered from the scene of the crime. She identified them as casings for .40 caliber hollow-point bullets. She testified that the

16

ammunition was made by "Smith & Wesson Winchester." She also testified that one of the boxes of ammunition recovered from the Alcalas' white Dodge truck contained .40 caliber hollow-point bullets also made by Smith & Wesson Winchester.

## K. Investigator Michael Perez

The State called Investigator Michael Perez of the Pharr Police Department as a witness. He testified regarding a statement made by Alcala after he was taken into custody and transported to the police station. During Perez's testimony, the trial court admitted into evidence a video recording of Alcala's statement, which was played to the jury in its entirety. Before the interrogation began, the following exchange took place between Alcala and an unidentified officer:

> Officer: That's it, man, you are just going to talk to him real quick. Give your side of the story or whatever.
>
> Alcala: I don't know. Like *me aguito* because he is my friend, like, I don't want to fight him, like, *me aguito*, but like *chingada madre pinche vato*. It's a trip. Oh, well, you know, sometimes friends fight friends. And I know his mom. I told him [sic] mom, "Mom, I'm sorry. I didn't want to disrespect, but I wanted to know why David did that because he was at my house."
>
> Officer: Wait until the investigator gets here, man, just tell him all that. . . .

Then, Investigator Perez arrived and initiated the interrogation. Initially, he focused on the altercation that occurred between David and Alcala earlier in the night. Alcala described having dinner with his girlfriend at Whataburger. They returned home in Alcala's car. According to Alcala, David then "peeled out" in front of Alcala's house,

17

which prompted Alcala to follow David back to David's house.  Then, according to Alcala, the following exchange occurred:[5]

> So I see him and I got … there and I am like, "*Que onda, carnal*?"  I was like, "*Que onda, guey*?"  Like, "What's going on, bro?"  Like, "*Pos que pinche onda*?" …  And I'm like, "*Oh, este vato.*  Why are you talking to me like that way?"

> And he was like, "*No, que tu y tu pinche* green car."  And I'm like … "*Como que mi pinche vieja, guey*?  You are talking about my wife, Dude.  Chill the fuck out, bro.

> And he was like, "*No, que*" - - he's talking - - and he starts talking - - like telling me words because I guess he had backup in back of him.  And he started telling me things.  And I'm like, "Hey, bro, you know what, bro, like, we are in the same hood.  We've known each other from when we were kids, but you need to chill the fuck out, *vato.*"

> So he was like, "*No, pos orale, simon*," like you know.  And he kept on, "*No, y que me vale verga, y, pos, vajate a la verga, vajate a la verga, vajate a la verga* - -"

Alcala claimed that he was then assaulted by David and another man, "a *senior*," who was much bigger than he was—possibly Victor de la Cruz.  Alcala described being punched in the face repeatedly, bleeding from the nose, unsuccessfully trying to fight back, and essentially, being the victim of an assault.  According to Alcala, he returned to David's house with his father a short while later in an effort to resolve the conflict.  When that attempt failed, he went home to have sex with his girlfriend, which is when the police arrived at his house.  Unlike other witnesses who were interviewed by the police, Alcala did not report or acknowledge hearing gunshots.  Investigator Perez also thought it was strange that Alcala would want to have sex with his girlfriend after being assaulted.

---

[5]  The portions of the exchange that were in Spanish were not interpreted for the jury.

18

After getting Alcala's statement about what transpired before the shooting, Investigator Perez disclosed to Alcala the real reason for the interrogation:

Q       What do you think the reason is that you are here for?

A       Because I got in a fight.

Q       Okay.  Well, I am going to - - I am going to give you some news. There is two people that were murdered today, okay, they were shot.  And it was real close to your house.  And the person that was shot was your friend David and somebody else.

        Hold on.

        Those two people that got shot, they saw a white Dodge roll up to them and shoot them?

A       Uh-huh.

Q       A white Dodge that - - that matches your dad's truck and people already identified that truck.  Okay.

A       Uh-huh.

Q       Second of all, the investigators that went to your house - -

A       Uh-huh.

Q       - - located a weapon - -

A       Uh-huh.

Q       - - and located bullets that matched the bullets - - the bullet casings that we found at the scene.

A       Okay.

Q       Okay.  The other thing is we found evidence going into your car and blood there.

A       Yeah.

Q       So we - - we processed that vehicle as well for DNA.

A       Okay.

19

Q     And that's the reason why earlier today when I read you your rights, I asked you for DNA.

       Did you have anything to do with those two murders?

A     No, sir.

When Alcala did not confess, Investigator Perez made up a story about putting together a photo lineup that eyewitnesses had used to identify Alcala as the shooter. He made it seem like these witnesses had actually seen the shooting, even though that was not true. Ultimately, the phony photo lineup story did not work. Alcala continued to maintain his innocence.

Investigator Perez changed his approach. He began focusing on Alcala's father:

Q     Two people are dead, dude.

A     I didn't - -

Q     One of them was your friend. One of them is your friend that is dead right now. Why? Because of something stupid that happened before this.

A     Uh-huh.

Q     And you are still sitting there lying to me when we know you were there.

A     Where?

Q     At the scene of the shooting, where else?

A     No, sir.

Q     Okay. So you are going to let your dad take the blame for this. Because your dad is not going anywhere tonight *tampoco*. He's going to go in the same way you're in. The same way.

A     Okay.

Q     So you're claiming that your dad is the one that did this?

20

A       My dad - - I don't know.

Q       Okay.  So you don't know if your dad did this or not?

A       I don't know.

Q       Is he capable of doing this?

A       I don't know, bro.  I don't know…

Q       Just tell me exactly what happened, the reason why they got shot.  That's all I need to know.

A       I don't know…

Q       [Y]our dad is here.  He is already getting questioned.  Your dad is going to turn around and say, "You know what, I didn't shoot."

        What do you think he is going to say?  Do you think he is going to take the blame for you? . . .

A       Why would I risk my dad and tell my dad, "Dad, let's go kill these motherfuckers"?  I know that - -

Q       Out of anger.  Out of anything.  You guys got into a fight…

A       Homie, I can tell you - - sir, I can tell you right now, sir, really I can - - I can take care of my own self.  The only reason why I found my father is because my dad knows people around the neighborhood.  Okay? . . .

Q       All these [items of evidence] . . . came out of your house.  I don't know if you understand that.

A       For real?

Q       Identical.

        Yes.

A       Wow.

Q       Yeah, they are.  Don't act stupid.

A       I'm not.  Oh, again, wow.  Like, wow.

21

Q      Okay.

A      I'll be surprised.

Q      I'm telling you.  No, don't be surprised.  That's what it is. . . .  So you are still going to sit there and lie?

A      Yeah.

Q      You can make that dumb face all you want.  When it comes down to the Court I will remember that.

A      Okay.  All right, bro.

The interrogation ended shortly thereafter.  Alcala never confessed to any knowledge or involvement in the murders.  However, at the end of the interrogation, Investigator Perez asked Alcala if he was "still going to sit there and lie" and Alcala answered "yeah."

Investigator Perez also testified regarding the pink receipt from Matt's Cash & Carry that was recovered from the scene of the crime.  According to Perez, at least seven similar receipts from the same business were discovered on the floorboard near the front passenger seat of the white Dodge truck belonging to Alcala's father.  A bloody shoeprint was also observed on the passenger-side doorstep.  Based on this evidence, Investigator Perez believed that a passenger had exited the vehicle at the crime scene, inadvertently causing the receipt to fall out of the truck.  Investigator Perez also believed that the passenger then stepped in the blood of one of the victims before climbing back into the vehicle using the doorstep.  Based on all information acquired through the police investigation, Investigator Perez believed that Alcala and his father were both involved in the murders of David Garcia and Victor de la Cruz.

22

## L. Crystina Vachon

The State called Crystina Vachon as a witness. She testified that she is employed by the Bexar County Criminal Investigation Laboratory in San Antonio. Her area of expertise is forensic science, and she works in the trace evidence section. In connection with the investigation into the double homicide involving David Garcia and Victor de la Cruz, she used an electron microscope to test various skin and clothing samples collected by the Pharr Police Department for evidence of gunpowder residue.

Vachon's testing revealed "three particles containing lead, barium, and antimony and two particles containing lead and antimony on the left hand of … [Alcala's father]." According to Vachon, this indicated that he may have discharged a firearm, handled a discharged firearm, or been in close proximity to a firearm that was discharged. No similar evidence was detected in the samples taken from Alcala's hands. However, she testified that such evidence is "delicate" and can be lost if an individual washes his hands or takes a shower.

Vachon tested the black muscle shirt that Alcala was wearing on October 8, 2010. One sample from the shirt had "five particles containing lead, barium and antimony, one particle containing lead and antimony, and four particles containing barium and antimony." A second sample from the same shirt had "three particles containing lead, barium, and antimony, two particles containing lead and antimony, and three particles containing barium and antimony." According to Vachon, this "indicates that the shirt may have come in contact with a discharged firearm or was in close proximity to a discharging firearm." Similar evidence was recovered from the blue jeans that Alcala was wearing that night and from the blue jeans, grey shirt, and jacket

23

Alcala's father was wearing, again indicating that these articles of clothing may have been in close proximity to a discharged firearm.

## M. Vanessa Nelson

The State called Vanessa Nelson as a witness. She is employed by the Texas Department of Public Safety Crime Laboratory in Hidalgo County. She is assigned to the "Serology/DNA" section. She is a supervisor in that department, but she also "work[s] cases." She testified that various samples were submitted to her for DNA (deoxyribonucleic acid) testing by the Pharr Police Department in connection with the double-homicide involving David Garcia and Victor de la Cruz. These items included blood samples from David Garcia and Victor de la Cruz, the weapons recovered from Alcala's father, and the clothing worn by Alcala and his father on the night of the murders, as well as swabs taken from various places, such as different areas inside and outside of the white Dodge truck and the Cadillac CTS.

The results of Nelson's testing showed that blood consistent with the DNA profile of David Garcia was found on the passenger-side doorstep of the white Dodge truck belonging to Alcala's father and on a pair of shoes recovered from the Alcalas' home.[6] The jeans Alcala was wearing that night had blood consistent with the DNA profile of Victor de la Cruz.

---

[6] There was no direct testimony that the shoes belonged to Alcala; however, they were recovered from his bedroom. Investigator Janie Arrellano testified that the shoes matched the bloody shoeprint discovered on the passenger-side doorstep of the white Dodge truck belonging to Alcala's father. Alcala's attorney objected to this testimony, but the trial court overruled his objection. Alcala challenges this ruling in his fourth issue in this appeal.

**N. Norma Jean Farley, M.D.**

The State also called Norma Jean Farley, M.D. as a witness. She served as the forensic pathologist for Hidalgo County. She performed autopsies on David Garcia and Victor de la Cruz. She testified that David Garcia was twenty-one years of age and that Victor de la Cruz was thirty-five and that the cause of death for both men was homicide. She testified that David Garcia was shot through the mouth. The bullet "didn't actually enter the part of the brain where the skull sits." Instead, the bullet "actually entered the head and then travelled into the neck where it transected the internal - - left internal carotid artery." He died from blood loss. Dr. Farley testified that Victor de la Cruz sustained one gunshot wound to the head and a second to the chest. Both wounds were fatal. She could not determine the order in which the wounds were inflicted.

**O. The Jury's Verdict**

The jury found Alcala guilty of capital murder. The State did not seek the death penalty, and Alcala was given a life sentence. He subsequently filed this appeal.[7]

**II. SUFFICIENCY OF THE EVIDENCE**

In his first issue, Alcala contends that the evidence is insufficient to support the jury's verdict because the State failed to establish that he shot either of the victims or that he was a party to the capital murder.

**A. Standard of Review**

When we review the sufficiency of the evidence to support a verdict under the sufficiency standard set out in *Jackson v. Virginia*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational

---

[7] In a separate trial, Alcala's father, Eloy Heraclio Alcala, Sr., was also tried and convicted for capital murder. His appeal is pending before this Court in cause number 13-12-00259-CR.

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). "This standard accounts for the fact[-]finder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quotations omitted). "[W]e determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* (quotations omitted). "Our review of all of the evidence includes evidence that was properly and improperly admitted." *Id.* "When the record supports conflicting inferences, we presume that the fact[-]finder resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Id.* "Direct and circumstantial evidence are treated equally." *Id.* "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.*

**B. Applicable Law**

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quotations omitted).

In relevant part, the Texas Penal Code provides, "A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and . . . the person murders more than one person . . . during the same criminal transaction." TEX. PENAL CODE ANN. § 19.03(a)(7)(A). Under Section 19.02(b)(1) of the Texas Penal Code, "A person commits an offense if he . . . intentionally or knowingly causes the death of an individual." *Id.* § 19.02(b)(1) (West 2011).

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a) (West 2011). "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2) (West 2011). "In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Ransom v. State*, 920 S.W.3d 288, 302 (Tex. Crim. App. 1994) (en banc) (quotations omitted).

## C. Discussion

Alcala argues that the evidence is insufficient for two reasons: (1) there was no direct evidence that he shot either of the victims; and (2) there was no direct evidence that he encouraged, promoted, or assisted his father in committing the murders. We conclude that the evidence is sufficient to support the jury's verdict.

27

We begin by noting that "direct evidence of the elements of the offense is not required." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). "Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor." *Id.* "Circumstantial evidence alone can be sufficient to establish guilt." *Id.* Therefore, the lack of direct evidence that Alcala shot either of the victims is not dispositive. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) ("[T]he lack of direct evidence is not dispositive of the issue of a defendant's guilt."). More importantly, there was sufficient circumstantial evidence to establish that David Garcia and Victor de la Cruz were murdered and that Alcala was responsible for the murders. *See id.*

First, the evidence established that David Garcia was shot through the mouth and that Victor de la Cruz was shot in the head and the chest. Both men died as a result of their gunshot wounds. Dr. Farley testified that the cause of death for both men was homicide. From this, a rational juror could find that David Garcia and Victor de la Cruz were the victims of a double-murder. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (defining "murder"); *Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999) (en banc) (explaining that "specific intent to kill may be inferred from the use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result") (quoting *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986)).

Second, the evidence established that David Garcia and Victor de la Cruz were both shot with Smith & Wesson Winchester hollow-point bullets fired from a .40 caliber

28

weapon. Eyewitnesses reported hearing three gunshots fired in succession, indicating that the men were shot sequentially, not at the same time. Based on the foregoing, a rational juror could infer that the same weapon may have been used to kill both men and that there may have been only one shooter.

Third, the evidence established that, in the moments before they were killed, David Garcia and Victor de la Cruz were involved in a loud argument with the shooter and possibly someone else. From this, a rational juror could infer that the men probably knew their killer. *See Fischer v. State*, 268 S.W.3d 552, 554 (Tex. Crim. App. 2008) ("Evidence was also presented from which a rational jury could find that the victim probably knew her killer.").

Fourth, the evidence established that David Garcia knew Alcala and that they were "friends." The evidence also established that Alcala was involved in an argument with David Garcia that took place earlier that night. The evidence, particularly Alcala's statement to the police, indicated that Victor de la Cruz was also present during the argument between David Garcia and Alcala and that Alcala was therefore familiar with Victor de la Cruz as well.

Fifth, the evidence placed Alcala at the scene of the crime and established that he had the opportunity to commit the murders. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) ("Although motive and opportunity are not elements of murder and are not sufficient to prove identity, they are circumstances indicative of guilt."). David Garza testified that he saw the Dodge truck belonging to Alcala's father travel in the direction of David Garcia's house minutes before he heard gunshots. Maricela Garcia testified that Alcala and his father arrived at her house in a Dodge truck

29

and were looking for David minutes before she heard gunshots. Arturo Arredondo testified that after he heard gunshots, he went outside and saw a white Dodge truck drive off in the direction of Alcala's house. When the police arrived at Alcala's house, the hood of the truck was still warm, as if it had been driven recently.

At the crime scene, the police recovered a pink sales receipt from Matt's Cash & Carry. They found at least seven similar receipts from the same business on the front floorboard of the white Dodge truck that belonged to Alcala's father. As Investigator Perez testified, this indicated that Alcala had exited the vehicle at the scene of the crime, causing the receipt to inadvertently fall out of the truck. This theory was further supported by the bloody shoeprint found on the passenger-side doorstep of the vehicle that matched the DNA of David Garcia, as well as the shoes recovered from Alcala's bedroom, which also had blood matching the DNA of David Garcia. There was also blood discovered on Alcala's jeans that matched the DNA of Victor de la Cruz. Finally, there was evidence of gunpowder residue found on Alcala's clothing, indicating that he had recently been in close proximity to a firearm that was discharged. Based on the foregoing, a reasonable juror could find that Alcala was present at the scene of the crime and had the opportunity to commit the murders. *See Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996) (upholding murder conviction where defendant "was seen within a few blocks of the crime scene shortly before and shortly after the murder").

Sixth, the evidence established that Alcala had the means to commit the murders. *See Rios v. State*, 846 S.W.2d 310, 313 (Tex. Crim. App. 1992) (considering defendant's possession of murder weapon "several weeks prior to the killings" as

30

evidence of guilt). The victims were shot with a .40 caliber firearm, and the police recovered a .40 caliber handgun from the Alcalas' house. Furthermore, the shell casings recovered from the crime scene were for Smith & Wesson Winchester .40 caliber hollow-point bullets. Identical ammunition was recovered from the white Dodge truck belonging to Alcala's father. Based on the foregoing, a rational juror could find that the .40 caliber handgun recovered from the Alcalas' home was, in fact, the weapon used to murder David Garcia and Victor de la Cruz. Furthermore, a rational juror could also find that Alcala had access to, if not possession of, the murder weapon when the murders occurred. *See Madden v. State*, 799 S.W.2d 683, 692 (Tex. Crim. App. 1990) (en banc) (upholding murder conviction and noting "[p]erhaps most damaging is the evidence that appellant was in possession of the .22 caliber murder weapon").

Seventh, the evidence established that Alcala had a motive for committing the murders. *See Clayton*, 235 S.W.3d at 781 ("[A]lthough motive is not an element of murder, it may be a circumstance that is indicative of guilt."). Earlier in the evening, David allegedly disrespected Alcala by "peeling out" in front of his house. Then, after that, David allegedly disrespected Alcala's girlfriend by saying something about her "*pinche* green car."[8] According to the statement Alcala made to the police after the murders, David and a second man, possibly Victor de la Cruz, then assaulted Alcala in front of David's house. Disrespected and injured in the two encounters with David, Alcala returned to David's house seeking a third encounter, this time with the help of his father. When that failed, the men left "very upset" and "angry." Moments later, gunshots were heard and David Garcia and Victor de la Cruz were found dead in the street.

---

[8] "*Pinche*" is a Spanish word that was not defined for the jury.

Eighth, the evidence established that before the murders, Alcala manifested, by word and by deed, his intent to cause the death of David Garcia. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). The men had been in at least two intense encounters on the night of the murders. At least one of the encounters involved physical violence that caused bodily injuries to both men. Furthermore, just minutes before the murders, Alcala told David's mother, "Whether it's today or tomorrow, it's going to be his turn." This statement is particularly significant because Alcala made it after David's mother complained that Alcala had nearly hit and killed David with his vehicle just minutes before the shooting, which is also evidence that Alcala intended to cause the death of David Garcia. *See Ross v. State*, 133 S.W.3d 618, 624 (Tex. Crim. App. 2004) (upholding conviction for capital murder after noting that "[a]ppellant threatened . . . [the victim] with violence not long before she was murdered"). In talking to David's mother, Alcala expressed more than mere indifference to causing David's death. A rational juror could conclude that his remark and behavior were evidence of Alcala's intent to cause David's death. *See Turner v. State*, 600 S.W.2d 927, 929 (Tex. Crim. App. 1980) ("[T]he Court has consistently held that knowledge and intent can be inferred from conduct of, remarks by and circumstances surrounding the acts engaged in by an accused . . . .").

Ninth, the evidence established that Alcala fled the scene after David Garcia and Victor de la Cruz were killed. *See Clayton*, 235 S.W.3d at 780 ("We have recognized that a fact[-]finder may draw an inference of guilt from the circumstance of flight."). David Garza testified that after he heard gunshots, he looked outside and saw Alcala exit from the passenger side of his father's white Dodge truck, which was parked in the

32

street with the headlights off. Alcala opened and closed the hood to his Cadillac CTS and then disappeared inside the house. *See Hardesty v. State*, 656 S.W.2d 73, 78 (Tex. Crim. App. 1983) (upholding conviction where "appellant tried to avoid police apprehension").

Tenth, unlike other witnesses, Alcala did not report hearing gunshots and expressed no interest in the police investigation taking place literally right outside his door. Instead, he maintained that he went home to have sex with his girlfriend, which Investigator Perez found implausible. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("[I]nconsistent statements . . . and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt.").

In sum, the evidence established the following: (1) David Garcia and Victor de la Cruz were the victims of a double-homicide; (2) a single shooter used a .40 caliber weapon to kill both men; (3) the victims knew their killer; (4) Alcala knew the victims; (5) Alcala was present when the murders occurred; (6) the murder weapon was recovered from Alcala's home; (7) Alcala had a motive to kill the victims because David Garcia and a second man—possibly Victor de la Cruz—assaulted Alcala and disrespected him earlier that night; (8) Alcala manifested his intent to kill David Garcia by steering his vehicle toward David and telling David's mother that "[w]hether it's today or tomorrow, it's going to be his turn"; (9) Alcala fled the scene after the murders occurred; and (10) Alcala gave police an implausible explanation for what he was doing when the murders occurred.

Finally, we note that although Alcala did not testify at trial, the jury did view the video recording of the statement he made to the police on the night of the murders. The

33

jury watched as Investigator Perez broke "the news" to him that his friend David and another man had been murdered. The jury saw his reaction. They were able to assess whether he was lying or telling the truth when he professed his ignorance. Most importantly, the jury watched as Investigator Perez asked him whether he had any involvement in the murders. They saw his reaction. They heard his denial. And ultimately, they found that he was lying.

The United States Supreme Court has stated that the jury may regard "false statements in explanation or defen[s]e made or procured to be made as in themselves tending to show guilt." *Wilson v. United States*, 162 U.S. 613, 621 (1896). As Judge Learned Hand once wrote, a defendant's denial of wrongful conduct "may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *See Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952). Similarly, Judge Richard Posner has explained that a defendant does not have to testify—or in this case, give a statement to police—"but if he does and denies the charges and the jury thinks he's a liar, this becomes evidence of guilt to add to the other evidence." *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991), *aff'd on other grounds*, 506 U.S. 534 (1993). The Texas Court of Criminal Appeals has cited these decisions and indicated that their approach is appropriate when, as here, "the fact that a crime had occurred was established by other evidence." *Hacker v. State*, 389 S.W.3d 860, 872 (Tex. Crim. App. 2013).

Although no witness testified to seeing Alcala shoot either of the victims, after considering the combined and cumulative force of the incriminating evidence set forth

34

above, a rational juror could conclude, beyond a reasonable doubt, that Alcala was responsible for killing David Garcia and Victor de la Cruz as the primary actor, under the law of parties, or both. *See* TEX. PENAL CODE ANN. § 7.01(a); *Ransom*, 920 S.W.3d at 302 ("Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement."). This was not "a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012). Accordingly, Alcala's first issue is overruled.

### III. HEARSAY TESTIMONY

In his second issue, Alcala contends that the trial court erred in admitting the hearsay testimony of David Garza that Alcala was outside his house shouting that he was going to kill Garza's dog.

### A. Applicable Law

"The hearsay doctrine, codified in Rules 801 and 802 of the Texas Rules of Evidence, is designed to exclude out-of-court statements offered for the truth of the matter asserted that pose any of the four 'hearsay dangers' of faulty perception, faulty memory, accidental miscommunication, or insincerity." *Fischer v. State*, 252 S.W.3d 375, 378 (Tex. Crim. App. 2008) (citing TEX. R. EVID. 801, 802).[9] "The numerous exceptions to the hearsay rule set out in Rules 803 and 804 are based upon the rationale that some hearsay statements contain such strong independent, circumstantial guarantees of trustworthiness that the risk of the four hearsay dangers is minimal while the probative value of such evidence is high." *Id.* "The twenty-four hearsay exceptions

---

[9] "Hearsay" is "a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted." *See* TEX. R. EVID. 801(d). Hearsay is generally inadmissible. *See* TEX. R. EVID. 802.

35

listed in . . . Rule 803 may be roughly categorized into (1) unreflective statements, (2) reliable documents, and (3) reputation evidence." *Id.* at 379 (citing TEX. R. EVID. 803). "The rationale for all of the exceptions is that, over time, experience has shown that these types of statements are generally reliable and trustworthy." *Id.*

"The first set of hearsay exceptions, unreflective statements, are 'street corner' utterances made by ordinary people before any thoughts of litigation have crystallized." *Id.* "These unreflective statements used to be called '*res gestae,*' an imprecise Latin legalese term, because the speaker was not thinking about the legal consequences of his statements." *Id.* "In most instances, the speaker was not thinking at all; the statement was made without any reflection, thought process, or motive to fabricate or exaggerate." *Id.*

One of those "unreflective statements" exceptions to the hearsay rule is defined in Rule 803(1), the present sense impression: "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." TEX. R. EVID. 803(1). "Statements that qualify under this exception are not excluded by the hearsay rule, even though the declarant is available." *Fischer*, 252 S.W.3d at 380.

## B. Standard of Review

"The admissibility of an out-of-court statement under the exceptions to the general hearsay exclusion rule is within the trial court's discretion." *Lawton v. State*, 913 S.W.2d 542, 553 (Tex. Crim. App. 1995). The trial court will be "reversed only if the decision is outside the zone of reasonable disagreement." *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001). In other words, "before the reviewing court may

36

reverse the trial court's decision, it must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 578 (Tex. Crim. App. 2008); *see also Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011). Furthermore, "[i]t is well settled that an out-of-court 'statement' need not be directly quoted in order to run afoul of the hearsay rules." *Head v. State*, 4 S.W.3d 258, 261 (Tex. Crim. App. 1999).

## C. Discussion

At trial, David Garza testified that, on the night of the murders, he was asleep when the telephone rang and woke him up. His daughter-in-law answered the phone. Then, she knocked on the door of his bedroom. Garza was about to testify to what his daughter-in-law told him when counsel for Alcala made a hearsay objection, which the trial court overruled. Garza then proceeded to testify, "She says that - - that [Alcala] … was outside of my - - on - - front of my yard, on the street that - - yelling that he was going to kill the dog."

Later, Garza testified, "I looked out the window because my wife told me that - -" when Alcala's trial counsel made a second hearsay objection, which the trial court also overruled. Garza then proceeded to testify, "I woke up and I looked out the window and - - my window is right in front by the street, and I seen . . . [Alcala] in front of my yard. And my dog was barking and that's when I went down to see, you know, why he wanted to kill the dog because he was yelling something about killing the dog."

A few questions later, Garza explained that he did not hear Alcala yelling something about killing the dog: "That's what my sister-in-law was telling me by the

phone.  When I went down, I thought he was going to kill my dog, because that's what I heard from the phone."  Counsel for Alcala did not object to this testimony.

Viewing the testimony as a whole, rather than in isolated parts, it is clear that Garza testified about three different out-of-court statements made by three different women:  (1) one by his daughter-in-law; (2) a second by his wife; and (3) a third by his sister-in-law.  Although there were three different statements by three different speakers, each woman said essentially the same thing:  that Alcala was outside yelling something about killing Garza's dog.

On appeal, Alcala complains that each statement "constituted double hearsay and was not subject to any hearsay exception."  *See Sanchez v. State*, 354 S.W.3d 476, 485–86 (Tex. Crim. App. 2011) (citing TEX. R. EVID. 805) ("When hearsay contains hearsay, the [Texas] Rules of Evidence require that each part of the combined statements be within an exception to the hearsay rule.").  We agree with Alcala that each of the three statements contained an additional out-of-court statement by Alcala to the effect that he was going to kill Garza's dog.  But this was not hearsay-within-hearsay.  *See* TEX. R. EVID. 805.

First, "[i]t is well established that an extra-judicial statement or writing offered for the purpose of showing what was said rather than for the truth of the matter stated therein does not constitute hearsay."  *Crane v. State*, 786 S.W.2d 338, 352 (Tex. Crim. App. 1990).  Here, the statements by Garza's daughter-in-law, wife, and sister-in-law were offered to establish "the circumstances surrounding and leading to the shooting." *Id.* They established how Garza was awakened in the middle of night and why he was looking outside when he saw Alcala's father's white Dodge truck depart towards David

Garcia's house. As such, the statements were offered for the purpose of showing what was said rather than for the truth of the matter stated therein. *See id.* Accordingly, they were not hearsay. *See id.*

Second, even assuming the statements were hearsay, they were not subject to the hearsay rule. *See* TEX. R. EVID. 802. The women were describing to Garza what they were hearing at the time. Therefore, their statements fall within the "present sense impression" exception to the hearsay rule. *See* TEX. R. EVID. 803(a) (defining "present sense impression" as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter").

Third, Alcala's statement about killing the dog was not hearsay. *See* TEX. R. EVID. 801(d). "Rule 801(e)(2)(A) plainly and unequivocally states that a criminal defendant's own statements, when being offered against him, are not hearsay." *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999) (citing TEX. R. EVID. 801(e)(2)(A)). "This rule recognizes that the out-of-court statements of a party differ from the out-of-court statements of non-parties, and raise different evidentiary concerns." *Id.* "A party's own statements are not hearsay and they are admissible on the logic that a party is estopped from challenging the fundamental reliability or trustworthiness of his own statements." *Id.* Furthermore, "party admissions, unlike statements against interest, need not be against the interests of the party when made; in order to be admissible, the admission need only be offered as evidence against the party." *Id.* Accordingly, Alcala's statement about killing Garza's dog was not hearsay. *See* TEX. R. EVID. 801(e)(2)(A).

Finally, even assuming the statements were hearsay and improperly admitted into evidence, the error was not reversible. *See* Tᴇx. R. Aᴘᴘ. P. 44.2(b). Under the Texas Rules of Appellate Procedure, "Any other [non-constitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *Id.* Alcala does not assert that this was constitutional error. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (evaluating error in admission of hearsay testimony under the standard for non-constitutional error). Therefore, we apply the "substantial rights" test, under which the error must be disregarded unless "the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.3d 266, 271 (Tex. Crim. App. 1997).

As set forth above, counsel for Alcala did not object when Garza testified that his sister-in-law told him that Alcala was shouting something about killing his dog. This was essentially the same as the testimony about what Garza heard from his wife and daughter-in-law, to which counsel for Alcala did object. Furthermore, "it is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection . . . [because] defense counsel must object every time allegedly inadmissible evidence is offered." *Hudson v. State*, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984). Therefore, counsel's failure to object cured the error, if any, in the trial court's admission of the other statements into evidence. *See id.* The error, if any, was harmless. *See* Tᴇx. R. Aᴘᴘ. P. 44.2(b). Accordingly, Alcala's second issue is overruled.

#### IV. ALLEGED VIOLATION OF ALCALA'S SIXTH AMENDMENT RIGHT

In his third issue, Alcala contends that the trial court violated his Sixth Amendment right to confront and cross-examine witnesses by admitting hearsay statements through the testimony of David Garza. *See* U.S. CONST., amend. VI; *Crawford v. Washington*, 541 U.S. 36, 51–52 (2004); *Sanchez*, 354 S.W.3d at 485 ("In addition to the restrictions that the statute and the rules place on the admission of hearsay, the Sixth Amendment to the federal Constitution broadly limits the admission of hearsay by giving a defendant the right to be confronted with the witnesses against him."). However, Alcala's trial counsel only made a general hearsay objection to this testimony, which is not sufficient to preserve this issue for appeal. *See Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) ("An objection on hearsay [grounds] does not preserve error on Confrontation Clause grounds."); *Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004) (holding that general "hearsay" objection "failed to preserve error on Confrontation Clause grounds") (citing TEX. R. APP. P. 33.1(a)(1)). Accordingly, Alcala's third issue is overruled.

#### V. TESTIMONY ABOUT SHOEPRINT

In his fourth issue, Alcala contends that the trial court committed reversible error in allowing Janie Arrellano to testify that the bloody shoeprint on the passenger-side doorstep of Alcala's father's white Dodge truck matched the shoes found in Alcala's bedroom because Arrellano was not qualified as an expert in the area of shoeprints. We disagree.

"This type of testimony has long been admissible, in Texas and elsewhere, by *either* lay or expert witnesses." *Rodgers v. State*, 205 S.W.3d 525, 532 (Tex. Crim.

App. 2006) (emphasis in original). Furthermore, even assuming, *arguendo*, that the trial court erred in admitting Arrellano's testimony, the error was waived by counsel's failure to object. *See* TEX. R. APP. P. 33.1(a)(1). At trial, counsel for Alcala made the following objection: "Your Honor, if I may, Judge, I am going to object if she is going to give an opinion or if she'll be speculating as to if that is the same blood that matches the shoe on the rail, Judge." Counsel's objection was limited to Arrellano giving an opinion or speculating about whether the blood on the doorstep to the truck matched the blood on the shoes recovered from Alcala's bedroom. Counsel did not object to Arrellano stating her opinion that the bloody shoeprint matched the shoes recovered from Alcala's bedroom. *See* TEX. R. EVID. 103(a)(1). Therefore, because counsel's objection at trial does not comport with the issue raised on appeal, the error, if any, was waived. *See Penry v. State*, 903 S.W.2d 715, 729 (Tex. Crim. App. 1995) ("Because … [defendant's] trial objection does not comport with the issues raised on appeal, he has preserved nothing for our review."). Accordingly, Alcala's fourth issue is overruled.

## VI. CONCLUSION

The judgment of the trial court is affirmed.

_____
NORA L. LONGORIA
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
14th day of November, 2013.

42