

# NUMBER 13-12-00259-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI − EDINBURG

---

**ELOY HERACLIO ALCALA,**                                                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                        **Appellee.**

---

### On appeal from the 332nd District Court
### of Hidalgo County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Chief Justice Valdez**

Appellant, Eloy Heraclio Alcala, appeals his conviction for capital murder. TEX. PEN. CODE ANN. § 19.03 (West, Westlaw through 2013 3d C.S.). By three issues, which we have reordered, Alcala contends that: (1) the evidence was insufficient to support the jury's verdict; (2) the trial court erred by denying his motion to suppress a video of a police

interrogation; and (3) the trial court erred by denying his motion to suppress evidence obtained from an illegal search of his house. We reverse and remand for a new trial.

## I. BACKGROUND

At trial, the State offered witness testimony and physical evidence in support of its allegation that Alcala committed capital murder either as the principal or as a party, in tandem with his son, Eloy Jiovanni Perez Alcala (Jiovanni).[1]

### A. Officer Enrique Ontiveros

Officer Enrique Ontiveros testified that on October 8, 2010, while on patrol of the area of Pharr known as "Las Milpas," at approximately 1:34 a.m., he heard three gunshots. Officer Ontiveros drove toward the area where he believed the shots were fired. Subsequently, dispatch directed Officer Ontiveros to an intersection where reports indicated there were "two men down." Officer Ontiveros testified that the dispatcher advised responding officers to be on the lookout for a "gray or light colored truck." Upon arriving at the crime scene, he discovered a brown minivan and "two men down." He testified that he made contact with Arturo Arredondo, who lived "right in front of the crime scene." From Arredondo, he obtained information that the suspect vehicle was a white Dodge Ram pickup truck and relayed this information to dispatch.

The State admitted a video from Officer Ontiveros's dashboard camera into evidence and played it for the jury. As Officer Ontiveros was approaching the crime scene, the camera captured a light-colored Dodge truck parked on the side of the road, but Ontiveros testified that he did not notice the truck when he passed it.

---

[1] Previously, we issued an opinion affirming the Jiovanni's conviction for the murder, either as a principle or a party, of the victims in this case. *Alcala v. State*, ___ S.W.3d ___, No. 13-12-00173-CR, 2013 WL 6053837 (Tex. App.—Corpus Christi Nov. 14, 2013, pet. ref'd).

At the scene, Ontiveros spoke with Marisela Garcia, who arrived in an SUV after Officer Ontiveros. She identified herself as the mother of one of the victims, David Garcia. She stated that she had been looking for her son, who had been drinking all day and had gone for a walk. Officer Ontiveros testified that he observed two spent bullet casings and a pink receipt at the crime scene.

**B. Officer Jose Alejandro Luengo**

Officer Jose Alejandro Luengo testified that he responded to the dispatch call regarding "two men down" in order to "back up" Officer Ontiveros. The trial court admitted a video captured by Officer Luengo's dashboard camera, and the State played the video for the jury. Officer Luengo testified that the video revealed a white Dodge pickup truck with its driver's side door ajar parked on the roadway near the crime scene. This image was captured at 1:39 a.m. Officer Luengo explained that when he arrived at the crime scene with Officer Ontiveros, he discovered the two victims laying near the brown van "with blood around their heads and what appeared—gunshot wounds." Officer Luengo testified that he observed bullet casings, but was not involved in collecting any evidence. He testified that he then assisted with the search for a white Dodge pickup that had been reported as the suspect vehicle and that the officers discovered a vehicle matching that description parked in the driveway of a nearby house. He further explained that the vehicle parked in the driveway was the same vehicle that the dashboard camera recorded parked on the roadway.

**C. Arturo Arredondo**

Arturo Arredondo testified that he lives near the scene of murder. Appellant is his son's godfather. Arredondo was awakened by the sound of two gunshots at "around 1:00

3

to 1:30" on the night of the murder. He walked to his window and observed a "kind of white creamy" truck with a Ram emblem on the back driving away from the area. Arredondo testified that it was dark and that he "didn't see the whole truck." Arredondo watched the truck head south and turn right. On cross-examination, Arredondo clarified that he did not know if the truck he saw was "the Alcala truck" and agreed that there were several Dodge pickup trucks belonging to neighbors in the area. In front of his house, Arredondo also saw a van with its lights on and "somebody was on the floor." He then called 911.

### D. David Garza

David Garza lived across the street from Alcala's house at the time of the alleged murder. In the early morning hours, Garza's family received a call from his sister-in-law informing them that Alcala's son, Jiovanni, "was out in the street yelling that he was going to kill that damn dog." Garza testified that he owns a dog and was concerned that Jiovanni wanted to kill his dog. He went outside and watched Alcala's truck drive "around the corner on Laurel." He neither saw who was driving the truck, nor whether there were any passengers. Garza testified that the truck "stopped by [victim David Garcia's] house." On cross-examination, Garza clarified that he did not actually see the truck stop at Garcia's house, but that the truck stopped at some point before leaving the neighborhood.

Garza testified that he then went back into his house to use the restroom. While he was in the restroom, he heard three gunshots. On cross-examination, defense counsel asked if he heard the gunshots forty-five minutes to an hour after he went inside the house; Garza responded, "Yes. More or less, yes." He testified that he ran to his bedroom window to see what was going on, but he "couldn't see anything." Then he saw

4

Alacala's truck drive up to and park on the street in front of Alcala's house. Garza testified that Jiovanni exited the passenger side of the vehicle and walked towards his own car, a Cadillac, that was parked on the property. Jiovanni popped the hood of his Cadillac and then closed the hood. After a police car drove by, Alcala moved his truck into the driveway without turning on the headlights. Garza found it suspicious that Alcala failed to turn on his headlights.

Garza and his wife went outside, and Garza asked Alcala, "What happened?" and "Why was Jiovanni yelling?" Garza testified that Alcala responded, "Oh, it's just that they were fighting with him and—but I already took care of that." Garza's wife informed Alcala that they had heard gunshots. Garza testified that Alcala responded, "Really?" and "Well, I don't know." Alcala told Garza and his wife that he would see them in the morning because he had to work early in the morning. Alcala then went inside his house. Garza found it unusual that Alcala was not concerned because "every time something strange would happen like dogs barking—or loud noises or whatever, [Alcala] would shine a big old spotlight and he'd shine the spotlight to see what was going on in—in the neighborhood or in the area." On cross-examination, Garza testified that, at the time, Alcala was calm.

Garza testified that Alcala closed his gate and turned off the utility light over his storage area. Garza also observed two or three officers on the street near his house that were touching another white Dodge pickup truck that was similar to Alcala's truck. Garza heard the officers ask the owner if he had just gotten there and heard the owner respond that the truck had been there for a couple of hours. Garza testified that he and his wife walked over to the neighbor's property and that he directed the officers to Alcala's truck.

5

The officers entered Alcala's property and started touching the truck. One of the officers interviewed Garza about what he had seen that night.

### E. Marisela Garcia

Marisela Garcia, the mother of victim David Garcia, testified that on the night of her son's death, he arrived home around 12:00 or 1:00 a.m. He had been working in the fields that day with his cousin, victim Victor De La Cruz. Marisela heard David's truck arrive at their house, but when he did not come inside, she "got up to see why he wasn't coming in." Marisela testified that she opened the door to her house and discovered David fighting Jiovanni inside of a white car. She and a neighbor were able to separate the two men. Marisela brought David inside the house. She believed he had been drinking. She asked him, "Why are you fighting? You are friends." Marisela testified that David responded, "Look at what they did to me." She testified that David "was full of blood, a cut that he had on his forehead was bleeding a lot." David informed Marisela that they were fighting because "a female had honked at him." David then left the house and told Marisela that he would be back. Marisela testified that, as he was walking away from the house, Jiovanni, who was now driving his own car, "steered his car towards" David. David, however, continued walking away from the house.

Marisela testified that later, Jiovanni returned to her house with Alcala. They arrived in a white truck that Alcala was driving. Marisela testified that she "thought they had come to do something to us, because they both got there asking for [David.]" She testified that Jiovanni told her that they were looking for David's wife, and Alcala asked to speak to Marisela's husband. She recalled that they were both angry, but neither threatened to hurt her or any member of her family. Marisela explained to Jiovanni and

6

Alcala that neither her husband nor David was at the house and asked them to "leave it until tomorrow . . . . You can talk tomorrow once you are calmer." Marisela testified that Jiovanni responded, "Whether it's today or tomorrow, something is going to happen."

Marisela testified that Jiovanni and Alcala then left the house, with Alcala driving the white truck and Jiovanni in the passenger seat. She stated that they were traveling south when they left the house. She did not see the truck turn. "Immediately" after, Marisela saw Victor De La Cruz's van pass by her house, also heading south. She saw that Victor was driving the van but could not see whether David was in the van. She then stated, "When the van passed by, I was outside so that when the van passed by and almost—when it made a turn, I do not know how many minutes, I heard some gunshots." On cross-examination, defense counsel asked Marisela if she heard gunshots "quite a bit later" after she saw the van pass by her house; she responded, "It was almost — it was almost instantly when the van passed. It could have been a matter—it was when the van passed by we heard the gunshots when we are talking outside, and that's when the police passed by very fast."

Marisela testified that when she heard the gunshots, "I felt that it could have been my son." She saw a policeman drive by "very fast" and asked a neighbor to take her to the scene of the crime. Marisela testified, "when I saw them there, lying there, I thought immediately that it had been Jiovanni because he is the one that had fought with him."

**F. Janie Arrellano**

Janie Arrellano testified that she is an ID Tech with the Pharr Police Department. She reported to the crime scene on October 8, 2012. At the scene, she recovered two bullet casings and a pink receipt. Arrellano was also present at the search of Alcala's

7

residence. At the residence, Arrellano photographed two vehicles parked in the driveway, a white truck and a white Cadillac. Arrellano observed blood "that was practically all over" the Cadillac. The trial court admitted a video of the search of Alcala's property, and the State played it for the jury. As the video played, Arrellano testified that there were several pink receipts located in Alcala's truck. She testified that "[t]o my—to my opinion, I thought to myself they were kind of—looked like the same—kind of the—the receipt we had found at the crime scene." She stated that all of the receipts that were found were from "Matt's Building and Materials." Arrellano testified that live rounds of bullets were found, one in a cup holder and several in the back of the truck. There was also a backpack with magazine clips. All of the bullets found in the truck were .40 caliber Winchester Smith & Wesson bullets. Arrellano testified that the casings from the crime scene were also .40 caliber Winchester Smith & Wesson.

Arrellano testified that the white Dodge Ram was processed at the police station. As the video played, she identified blood that was found on the step outside of the truck leading to the passenger seat. Arrellano was not sure whose blood it was. The blood on the step appeared in a pattern that was similar to a pattern on the sole of a pair of shoes found in Jiovanni's room.

### G. Officer Juan Manuel Quilantan

Officer Juan Manuel Quilantan testified that he headed to the scene of the crime after Officer Ontiveros asked "dispatchers if they had received any calls for shots fired." Upon arriving at the scene, Officer Quilantan made contact with Officer Ontiveros. Officer Quilantan testified that the suspect vehicle had been identified as a white Dodge Ram; he further testified that he was not aware of any eye-witnesses to the shooting. At the

scene, Officer Quilantan observed two bullet casings and a receipt laying near one of the casings. Officer Quilantan "got other officers to assist [him]" in searching the neighborhood for the suspect vehicle. They discovered a white pickup truck parked on the street. At the time, Officer Quilantan was with Officer Luengo and Officer Galavis.[2] Officer Quilantan testified that he touched the hood of the vehicle to determine if it had recently been driven and found that it was "cold, cold as can be." This indicated to Officer Quilantan that it had not recently been driven; he therefore believed that it was not the suspect vehicle.

The officers then walked towards Alcala's residence. Officer Quilantan testified, "That's when we spot the truck." He explained that it was difficult to see because it was a dark area inside the property and there was a tree blocking the way. The property was enclosed completely by a metal fence. Officer Quilantan remembers seeing someone looking through the blinds from a window in Alcala's house. There was also a Cadillac CTS parked inside the property. The two officers decided to walk onto the property "just to eliminate any possible person of interest." Officer Quilantan touched the hood and grille of the white Dodge Ram, and it was warm. Sergeant Castillo then arrived at Alcala's house and asked Officer Quilantan if he had "seen the inside of the car." Officer Quilantan testified, "And that's when we found the—back portion of the front headrest of the car full of blood." On cross-examination, Officer Quilantan testified that, using a flashlight, he looked through the passenger side window of the Dodge Ram and observed a live round of ammunition.

---

[2] Officer Galavis also testified at trial.

The officers then decided to speak with the owners of the property. The officers knocked on the door and spoke with Alcala. The officers asked to speak to Jiovanni, and they read Jiovanni his *Miranda* rights. Officer Quilantan could not remember if he could see any visible injuries on Jiovanni. He testified that Alcala was "being cooperative a hundred percent" and that Alcala told Jiovanni, "Hey, tell them the truth."

The officers found Jiovanni's girlfriend in his room. They read her *Miranda* rights and transported her to the police department for further questioning. Officer Quilantan also discovered brown boots in Jiovanni's room. After reviewing a picture of the boots, Officer Quilantan explained that the soles of the boots had a distinctive pattern, what he described as a "'K'—it looks like 'K's' with a little oval." As Arrellano testified earlier in the trial, the pattern on the bottom of the shoes matched a bloody foot print discovered on the step leading to the passenger door of Alcala's pickup truck.

## H. Sergeant Daniel Leal

Sergeant Daniel Leal responded to Officer Ontiveros's call to dispatch and arrived at the scene after it had been secured. He testified that he was unaware of any eye-witness to the shooting. Sergeant Leal joined the other officers at Alcala's home after they had discovered and examined the white Dodge Ram in the driveway. He recalled that Sergeant Castillo made the decision to knock on Alcala's door. Sergeant Leal testified that Alcala answered the door and was cooperative with them. He had Alcala sign a consent form allowing the officers to search his house and the Cadillac and white Dodge Ram in the driveway. The State offered and the trial court admitted into evidence the consent to search form signed by Alcala. Sergeant Leal testified that Alcala also gave his consent to search verbally.

10

Alcala then told the officers where to find several items that he said might interest them. Specifically, he instructed them to look underneath the backseat of the Dodge Ram where the officers found a duffle bag with magazines of ammunition. Alcala also voluntarily informed the officers that he had a ".40 caliber short rifle" in the house. Alcala retrieved the rifle from a closet in his bedroom and gave it to Sergeant Leal. Because .40 caliber bullet casings were found at the scene of the murders, the officers originally believed that this was the murder weapon, but, as revealed later at trial, after the police completed lab analysis, they eventually discounted this rifle as the murder weapon.

Alcala also voluntarily turned over a nine-millimeter rifle to Lieutenant William Ryan.[3] The prosecutor showed Sergeant Leal photographs of ammunition collected from the Dodge Ram. Leal identified the ammunition as .40 caliber Smith & Wesson hollow-point bullets. On cross-examination, Sergeant Leal testified that there were no weapons found in the truck, only ammunition.

## I. Sergeant David Castillo

Sergeant David Castillo originally reported to the scene of the crime, but quickly proceeded to Alcala's house. At Alcala's house, he interviewed Jiovanni. Jiovanni was holding an icepack over his eye, but Sergeant Castillo observed no other injuries. Sergeant Castillo asked Jiovanni why there was blood in his car, to which he responded that he had been involved in an altercation with David Garcia earlier that day. Sergeant Castillo then ceased questioning Jiovanni and advised that he be transported to the police station.

---

[3] Lieutenant Ryan also testified at trial.

## J. Investigator Michael Perez

Investigator Michael Perez was designated the lead investigator at the crime scene. He observed .40 caliber bullet casings and a pink receipt on the ground and testified that there were no eye-witnesses to the shooting at the crime scene. Investigator Perez proceeded to the police station after being informed that two suspects had been transported there.

Investigator Perez was informed that a .40 caliber rifle had been recovered from the suspects' home. He explained that he originally believed that the .40 caliber rifle was the murder weapon. However, he later learned that after the gun was submitted for analysis, lab testing concluded that it was not the murder weapon. He testified that the officers should have performed a more thorough search for more weapons at Alcala's house.

## K. Alcala's Interrogation Video

Investigator Robert Vasquez testified that he was involved in the interrogation of Alcala at the police station. He read Alcala his *Miranda* warnings and asked him questions. Subsequently, the State recalled Investigator Perez, who testified that he was also present and asked Alcala questions during the interrogation. The video of the interrogation was admitted into evidence and played for the jury.

During the interrogation, Alcala explained that Jiovanni woke him up around 11:30 or 11:45 p.m. to inform him that he had been in an altercation with David Garcia. Jiovanni had lacerations and was bleeding form his head. Jiovanni informed Alcala that David was insulting him and his girlfriend. Alcala explained to the investigators that Jiovanni was very upset. Alcala observed blood in Jiovanni's car. Alcala tried to stop Jiovanni from

leaving the house to confront David. Jiovanni got back in his car and drove away, but quickly made a u-turn and returned to Alcala's house. Jiovanni repeatedly told his father that he was worried that, "They're going to come over here." Alcala told Jiovanni, "you know what, son, let's go talk" and drove Jiovanni to Marisela and David Garcia's house. Alcala stated his intention was just to "talk to them." Alcala put his .40 caliber rifle in the back seat of his car when he drove to the Garcia's house, but he told the investigators that the gun never left the car. He informed the investigators that he put the gun in the car "for protection" and explained that investigators recovered the gun from the house because he always brings the gun back in the house when he goes to sleep.

Alcala explained that after he and Jiovanni arrived at the Garcia's house, Marisela Garcia informed them that David was drunk and "making a bunch of problems." During the conversation, Alcala observed "a sillhoutte walking" down the street. Marisela informed them that it was David. Alcala told Jiovanni to leave him alone. Jiovanni walked towards the silhouette but turned around and did not exchange words with David Garcia. Jiovanni was crying, and he and Alcala apologized. Another man arrived and told Alcala that David Garcia was "very drugged up, and he's all beat up, and that happens to him."

Alcala stated that he apologized and shook hands with Marisela, then drove Jiovanni back to their house. He stated that he parked his truck "inside the property." When asked why one of the officer's dashboard videos showed his truck parked outside of his property, Alcala responded, "It must have been outside the property for maybe five, ten minutes, when I opened the gate . . . ." Investigator Perez informed Alcala that it was obvious the truck was outside and either Alcala or Jiovanni moved it inside the property. Alcala responded, "I'm a hundred percent positive that the truck did not move." However,

13

later during the interrogation, Alcala explained that he parked outside of the house, went inside his house to talk to his wife leaving the truck parked outside of the gate, then went back outside and moved the truck inside the property. Alcala stated that after he parked his truck inside the property, he initially left the gate open and went back in the house to make sure everything was okay, then returned outside to close the gate.

Alcala initially told the investigators that he did not speak to any of his neighbors after returning from the Garcia's house. Investigator Perez responded, "You're lying again," and told Alcala that his neighbor, Garza, had informed the police that he spoke with Alcala while Alcala was locking his gate. Alcala explained that he spoke with Garza, but "this is when the fight was happening" between Jiovanni and David Garcia. Investigator Perez informed Alcala that Garza claimed that the conversation occurred after he heard gunshots. Alcala responded, "that's impossible," but later stated that Garza had asked him whether he had heard any gunshots. Officer Perez replied, "So obviously it happened after the gunshots, not during the fight, you already lied again." Alcala told the officers that he did not hear the gunshots, and when Garza informed him about the gunshots, he did not attempt to investigate the circumstances further. Investigator Vasquez asked, "Officer that was getting to the location, heard the gunshots, your neighbor who was probably inside heard gunshots, Marisela's house heard the gunshots, but you didn't hear them?" Alcala responded, "I didn't hear them."

Alcala explained that he keeps a .40 caliber Kal-Tec sub 2000 rifle by his side while he sleeps. Alcala stated that the gun was with him at all times that night. He stated that he uses Winchester hollow-point .40 caliber rounds. He told the officers that he fired the gun earlier that day at his father's property. Alcala stated he practiced his shooting

14

because he has a deer lease and he loves to go hunting, but then explained that he does not use the .40 caliber rifle to go hunting. Alcala initially stated that the officers should be able to find casings at the property. Later during the interrogation, Alcala informed the officers that they may not be able to find casings because when he was done shooting, he gathered the casings and threw them in a nearby ditch.

The investigators continued to ask Alcala questions about his son, and Investigator Perez repeatedly told Alcala he was lying and that he was changing his story, which Alcala, in turn, repeatedly denied. Specifically, Alcala stated, "but, I'm sorry sir, but I don't—I don't believe in that. You're—you're actually wanting for me to admit to something that I have not done, to draw a conclusion and to put a stop to it . . . ." When Investigator Perez accused Alcala of driving to the Garcias' house to protect his son, Alcala responded, "I spoke to the family." Throughout the interrogation, Alcala consistently denied any involvement in the deaths of the victims.

Following the publication of the video, the State asked Investigator Perez, "When you entered the room and when you were questioning Alcala, what were you thinking at that point?" Investigator Perez responded, "After lie, after lie, things that weren't adding up, that's what we were trying to work ourselves to, try to get him to understand that we did have people telling us different stories from what he was claiming." Investigator Perez explained that he raised his voice during the questioning because "obviously we were proving him wrong, he still didn't understand and that's the reason why my voice was raised." Investigator Perez testified regarding the following inconsistencies in Alcala's answers during the interrogation: (1) Alcala initially stated that his truck was never parked outside the gate, but when the investigators informed him that the police had dashboard

15

camera video and statements from his neighbor to the contrary, he changed his story; (2) Alcala originally denied that he had spoken to a neighbor, but then changed his story when the investigators informed him that they had interviewed his neighbor, Garza; (3) Alcala initially claimed that he never saw any police units pass by his house, but later admitted that he did; (4) Alcala changed his description of the color of his truck from "vanilla" to "yellow"; (5) Alcala claimed he had been practicing shooting in anticipation of going deer hunting with a .40 caliber rifle that he later admitted he did not use for deer hunting; (6) Alcala explained that the officers would be able to find casings where he had been practicing his shooting, but when Investigator Perez stated that he was going to search for the casings, Alcala stated that he had thrown them in the water. Investigator Perez testified that he found it suspicious that Alcala admitted that he brought a gun to confront the victim's mother at 1:00 a.m. The State also elicited testimony from Investigator Perez indicating that, during the interrogation, Alcala explained that there is a gun safe in his house, and that he owns multiple guns that were not turned over to the police. Investigator Perez explained that he did not order a search of the safe after he learned about it because the "officers did not secure the location."

During cross-examination, Investigator Perez admitted that, at that point, the investigation was focused on Jiovanni because he had fought with one of the victims earlier in the evening and therefore had "more motive" to commit murder.

### L. Other Witnesses

Norma Jean Farley, M.D, a forensic pathologist for Hidalgo County, testified that David Garcia was shot through the mouth and died from blood loss. Dr. Farley testified that Victor de la Cruz sustained fatal gunshot wounds to his head and chest.

16

In addition, the State elicited testimony from: Jose Angel Zuniga, forensic scientist for the Texas Department of Public Safety (TDPS); Vanessa Nelson, section supervisor for the serology/DNA section of the TDPS Crime Laboratory; Carlos Vela, latent print examiner for the TDPS Crime Laboratory; Dr. Richard Parent, firearms and tool marks examiner for the TDPS Crime Laboratory; and Cyrstina Vachon, forensic scientist in the trace evidence section of the Bexar County Criminal Investigation Labratory. These witnesses testified that reports and analysis of the evidence in this case established that: (1) blood from the shoeprint discovered on the passenger side of Alcala's Dodge Ram was consistent with the DNA profile of David Garcia; (2) blood found on Jiovanni's jeans discovered in his room was consistent with the DNA profile of Victor de la Cruz; (3) there was gunshot residue on Alcala's left hand and on Jiovanni's blue jeans; (4) the bullet casings found at the crime scene were the same make and caliber as the bullets discovered in Alcala's truck; and (5) the bullets found at the crime scene could not have been fired by the .40 caliber rifle recovered from Alcala's house.

## M. The Verdict

The trial court, in its charge, instructed the jury to find Alcala guilty if he either caused the death of the victims by shooting them or "with the intent to promote or assist the commission of the offense by [Jiovanni], by encouraging, directing, aiding or attempting to aid [Jiovanni] to commit the offense of causing the death" of the victims. The jury found Alcala guilty of capital murder and assessed punishment at life in prison.

## II. SUFFICIENCY OF THE EVIDENCE

By his first issue, Alcala contends that the evidence was legally insufficient to support the jury's verdict. We disagree.

17

## A. Standard of Review and Applicable Law

When we review the sufficiency of the evidence to support a verdict under the sufficiency standard set out in *Jackson v. Virginia*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). "This standard accounts for the fact[-]finder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quotations omitted). "[W]e determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* (quotations omitted). "Our review of all of the evidence includes evidence that was properly and improperly admitted." *Id.* "When the record supports conflicting inferences, we presume that the fact[-]finder resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Id.* "Direct and circumstantial evidence are treated equally." *Id.* "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.*

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the

particular offense for which the defendant was tried." *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quotations omitted).

In relevant part, the Texas Penal Code provides, "A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and ... the person murders more than one person . . . during the same criminal transaction." TEX. PENAL CODE ANN. § 19.03(a)(7)(A). Under Section 19.02(b)(1) of the Texas Penal Code, a person commits murder if he "intentionally or knowingly causes the death of an individual." *Id.* § 19.02(b)(1) (West, Westlaw through 2013 3d C.S.).

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a) (West, Westlaw through 2013 3d C.S.). "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2) (West, Westlaw through 2013 3d C.S.). "In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (en banc) (quotations omitted). Under the law of parties, proof of motive is admissible as a circumstance indicating guilt. *Harris v. State*, 727 S.W.2d 537, 542 (Tex. Crim. App.1987); *Miranda v. State*, 813 S.W.2d 724, 733 (Tex. App.—San Antonio 1991, pet. ref'd)

19

"[D]irect evidence of the elements of the offense is not required." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). "Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor." *Id.* "Circumstantial evidence alone can be sufficient to establish guilt." *Id.* Therefore, the lack of direct evidence that Alcala shot either of the victims is not dispositive. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) ("[T]he lack of direct evidence is not dispositive of the issue of a defendant's guilt.").

## B. Discussion

As an initial matter, it is undisputed that David Garcia and Victor de la Cruz were the victims of a double-murder. The State presented evidence that David Garcia was shot through the mouth and that Victor de la Cruz was shot in the head and the chest. Both men died as a result of their gunshot wounds. Dr. Farley testified that the cause of death for both men was homicide. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (defining "murder"); *Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999) (en banc) (explaining that "specific intent to kill may be inferred from the use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result") (quoting *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986)).

Further, the evidence showed that Alcala's son, Jiovanni, was injured in an altercation with one of the victims on the night of the murder; that Jiovanni was overheard at Alcala's house loudly threatening, "I'm going to kill that damn dog"; and that, after hearing his son's statements, Alcala retrieved his gun, drove his son back to the victim's

20

house, and asked to speak with the victim. A jury could reasonably infer that Alcala possessed a motive to commit the murders, either as a principal or a party, in order either to protect his son or to exact revenge on his son's assailant. *See Clayton*, 235 S.W.3d at 781 ("[A]lthough motive is not an element of murder, it may be a circumstance that is indicative of guilt.").

Moreover, there was testimony establishing that Alcala drove his truck in the same direction that the victims drove just before the gun shots were heard; that a witness observed a truck matching the description of Alcala's truck drive away from the scene immediately after he heard gunshots; and that Alcala's neighbor observed Alcala's truck return to Alcala's house shortly after he heard gunshots. This evidence supports an inference that Alcala was in the same place at the same time as the victims when the murders occurred and demonstrates that Alcala had the means and opportunity to commit the murders. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) ("Although motive and opportunity are not elements of murder and are not sufficient to prove identity, they are circumstances indicative of guilt."); *Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App.1996) (upholding murder conviction where defendant "was seen within a few blocks of the crime scene shortly before and shortly after the murder").

The State also presented physical evidence showing that bullets were discovered in Alcala's truck that matched casings found at the crime scene; that receipts found in Alcala's truck were similar to those found at the crime scene; that a shoe print with victim David Garcia's blood was discovered on the step leading to the passenger side of Alcala's truck and matched a shoe recovered in Jiovanni's room, and that victim Victor de la Cruz's blood was found on Jiovanni's jeans. In addition, the gunshot residue indicating that

Alcala had fired a gun on the day of the murder further supports an inference that he shot one or both of the victims. *See Mowbray v. State*, 788 S.W.2d 658, 663 (Tex. App.—Corpus Christi 1990, pet. ref'd) (affirming a conviction in part because gunshot residue was found on the sleeve of the appellant's nightgown); *see also Firo v. State*, No. 13-03-122-CR, 2004 WL 305977, at *3 (Tex. App.—Corpus Christi Feb. 19, 2004, no pet.) (mem. op., not designated for publication) (affirming a murder conviction in part because gunshot residue was found on the appellant's sweatshirt).

Moreover, Alcala's actions after the murders were committed support an inference that he was involved in the murders either as the shooter or part of a common understanding or design with Jiovanni. *See Hinojosa v. State,* 4 S.W.3d 240, 253 (Tex. Crim. App.1999) (describing defendant's suspicious behavior following murder as a circumstance of guilt); *Ransom*, 920 S.W.2d at 302 ("In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act."). Alcala's neighbor, David Garza, testified that Alcala's truck returned to Alcala's house soon after gunshots were fired. Alcala admitted that when he returned home, he first parked the car on the street outside his house, but then returned to the car and moved it back inside the property. Garza testified that Alcala moved his truck inside his gate after a police car passed the house, that Alcala did not turn on the truck's headlights, and that Alcala turned off the light over his utility area, which was usually left on overnight. *See Guevara*, 152 S.W.3d at 50 ("Attempts to conceal incriminating evidence . . . [are] circumstances of guilt.") Garza also testified that it was unusual that Alcala did not seem concerned that gunshots

22

had been fired because Alcala was usually proactive in investigating suspicious activity in the neighborhood.

Finally, the jury observed the video recording of the statement Alcala made to police.[4]  In the video, Investigator Perez repeatedly pointed to inconsistencies in Alcala's explanations and directly accused him of lying.  Further, at trial, Investigator Perez testified that Alcala made multiple inconsistent statements, and that during the interrogation, the investigators were "proving him wrong."  As the United States Supreme Court has stated, the jury "may regard false statements in an explanation or defen[s]e made or produced as in themselves tending to show guilty."  *Wilson v. United States*, 162 U.S. 613, 621 (1896).  The Texas Court of Criminal Appeals has indicated that this approach is appropriate when "the fact that a crime has occurred was established by other evidence."  *Hacker v. State*, 389 S.W.3d 860, 872 (Tex. Crim. App. 2013).  The jury was therefore entitled to infer that the inconsistent statements made by Alcala in relation to his actions before and after the murder were evidence of his guilt.  *See Wilson*, 162 U.S. at 621; *Hacker*, 389 S.W.3d at 872.

Considering the foregoing evidence, we hold that a rational juror could conclude, beyond a reasonable doubt, that Alcala was responsible for killing David Garcia and Victor de la Cruz, as the primary actor, under the law of parties, or both.  *See* TEX. PENAL CODE ANN. § 7.01(a).  This was not "a determination so outrageous that no rational trier of fact could agree."  *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012).

---

[4] While we later conclude that the trial court erred by failing to suppress the video of Alcala's statement, we still consider it as evidence in our sufficiency review.  *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001) ("When conducting a sufficiency review, we consider all the evidence admitted, whether proper or improper."); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999) ("[W]hen conducting a legal sufficiency review, this Court considers all evidence in the record of the trial, whether it was admissible or inadmissible.").

Alcala's first issue is overruled.

### III.    MOTION TO SUPPRESS POLICE INTERROGATION VIDEO

By his second issue, Alcala argues that the trial court erred by failing to suppress the video of Alcala's police interrogation. Alcala claims that he invoked his right to counsel before providing statements, but that the investigator continued the interrogation. Alcala argues that his statements at the interrogation were used to incriminate him at trial when the video was played for the jury, the State elicited testimony from the investigators involved in the interrogation, and the State made multiple references to the interrogation during closing arguments.

At a suppression hearing held prior to trial, the State admitted a video of the interrogation into evidence. The State also admitted a transcript of the interrogation for the trial court to review. During the interrogation, while Investigator Vasquez was reading Alcala his *Miranda* rights, the following exchange occurred[5]:

| [Investigator Vasquez]: | Down here it says, If so, would you like to waive your rights? Meaning I'll—yes, you want to give me your side of the story regarding what happened. |
| [Alcala]: | Sir, if this is happening, should I have an attorney then?[6] |
| [Investigator Vasquez]: | Do you want an attorney, or do you want to consult an attorney, or what is it that you want to do? |

---

[5] The following exchange is taken from the transcript admitted by the State at the suppression hearing.

[6] We note that there is some dispute over whether Alcala asked, "should I have an attorney?" or whether he asked "can I have an attorney?" The reporter's record from when the video was played at trial states, "can I have an attorney?" but the transcript of the interview, admitted by the State during the suppression hearing, reflects that Alcala asked, "should I have an attorney." We decline to make a determination regarding which word Alcala used because it would not affect our ultimate conclusion in review of the totality of the circumstances that he did invoke his right to an attorney.

24

| [Alcala]: | Yeah. Cause I mean, I'm not aware of what you just told me that—my son said—I don't— [inaudible due to overlapping voices]. |
| [Investigator Vasquez]: | Look, this is—this is—let me just explain to you so you know what's going on . . . . |

Investigator Vasquez proceeded to explain the circumstances of the murder. He informed Alcala that there had been an altercation between Alcala's son, Jiovanni, and one of the victims and that "there's witnesses that observed what had taken place." After which the following exchange occurred:

| [Investigator Vasquez]: | I need to ask you some questions about what happened. I want to know what happened. I want to know what your involvement is with that incident. |
| [Alcala]: | Mm-hmm. |
| [Investigator Vasquez]: | Okay, and the only way for me to do that is to read you your rights, get your side of the story regarding what happened, okay? |
| [Alcala]: | Okay. |
| [Investigator Vasquez]: | Cause your son is blaming you for some of those things that I said happened— |
| [Alcala]: | That's what I don't understand— |
| [Investigator Vasquez]: | Okay. So you do have an option, uh, you have the right to consult with an attorney if that's what you so choose, uh, I'll get a hold of your attorney. We're still going to come back in here and we'll get your side and clarify what your involvement is with this incident. Basically that's it. I want to hear your side. I want you to share with me what — what happened uh, tonight. Either you're a witness to what happened, or you're a suspect to what happened. Either or. You understand? |
| [Alcala]: | Yeah, I understand. |

25

| [Investigator Vasquez]: | So, if—would you like to continue, do you want to give me your side of the story? |
|---|---|
| [Alcala]: | Yes, I will give you my side—my side of the story. |

[Investigator Vazquez finished reading Alcala his Miranda rights.]

| [Investigator Vasquez]: | —uh, what I read to you? It says, If so, would you like to right—waive your rights? Meaning, yes you're going to waive your rights, yes you're going to waive your right to consult with an attorney at this point, and yes you want to give me your side of the story regarding what happened. Do you want to do that? |
|---|---|
| [Alcala]: | Yeah. Mm-hmmm. |

Alcala proceeded to sign the form provided by Investigator Vasquez indicating that he had been read his *Miranda* rights, and the investigators continued the interrogation.

## A. Standard of Review & Applicable Law

In reviewing claims concerning Miranda violations and the admission of statements made as the result of custodial interrogation, we conduct a bifurcated review. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). "[W]e measure the propriety of the trial court's ruling with respect to alleged Miranda violations under the totality of the circumstances, almost wholly deferring to the trial court on questions of historical fact and credibility, but reviewing de novo all questions of law and mixed questions of law and fact that do not turn on credibility determinations." *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011).

When a defendant asks for a lawyer, a police interrogation must cease until counsel has been provided or the defendant initiates further communication with the police. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *Davis v. State*, 313 S.W.3d

26

317, 339 (Tex. Crim. App. 2010).  To trigger law enforcement's duty to terminate the interrogation, a defendant's request for counsel must be clear, and the police are not required to attempt to clarify ambiguous remarks.  *Davis v. United States*, 512 U.S. 452, 461–62 (1994); *Davis*, 313 S.W.3d at 339.  Whether a statement referring to a lawyer constitutes a clear request for counsel depends on the statement itself and the totality of the circumstances surrounding the statement.  *Davis*, 313 S.W.3d at 339.  "We look to the totality of circumstances to determine whether any statement referencing counsel was really a clear invocation of the Fifth Amendment right; we do not look to the totality of the circumstances, however, to determine in retrospect whether the suspect really meant it when he unequivocally invoked his right to counsel."  *Gobert*, 275 S.W.3d 888, 893 (Tex. Crim. App. 2009).  The test is objective:  whether the defendant articulated his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.  *Id.*

Subsequent statements by a suspect may be used to show that he (a) further initiated conversation or (b) affirmatively waived the right he had previously invoked *Edwards*, 451 U.S. at 485; *Muniz v. State*, 851 S.W.2d 238, 253 (Tex. Crim. App.1993).  Subsequent statements do not render an unequivocal request for an attorney ambiguous.  *Smith v. Illinois*, 469 U.S. 91, 98 (1984).  "[T]he impetus for the remarks must come from the suspect, not from police interrogation or conduct that is the functional equivalent of interrogation."  *Martinez v. State*, 275 S.W.3d 29, 35 (Tex. App.—San Antonio 2008, pet. struck).  "Once a suspect has clearly invoked his right to counsel, no subsequent exchange with the police (unless initiated by the suspect) can serve to undermine the clarity of the invocation."  *Gobert*, 275 S.W.3d at 894–95 (determining that the appellant

27

did not waive his right to counsel when immediately after he clearly invoked right to counsel, he told the police that he was willing to talk to them in response to their questions "you don't want to talk?" and "you don't want to talk to us?").

In *Smith v. Illinois*, the United States Supreme Court reversed the Illinois Supreme Court and found that a suspect invoked his right to an attorney when an officer informed him of his *Miranda* rights and the suspect responded "yeah, I'd like to do that." 469 U.S. at 96. The Court found that the statement was a clear and unequivocal request for counsel and that the lower courts had improperly "construe[d] Smith's request for counsel as "ambiguous" only by looking to Smith's subsequent responses to continued police questioning . . . ." *Id.*

In *State v. Gobert*, the Texas Court of Criminal Appeals reversed an appellate court's finding that a suspect had not invoked his right to counsel. 275 S.W.3d at 893. The court reasoned:

> Immediately following the administration of his *Miranda* rights, upon being asked whether he understood them, the appellee unequivocally stated that he did not want to 'give up any right' in the absence of a lawyer. Under the circumstances, we may safely assume he meant 'any' of the rights that had just been read to him, and that the lawyer he referred to was the counsel to which the officers had just informed him he was legally entitled.

*Id.* The court continued, stating that:

> Just because a statement is conditional does not mean it is equivocal, ambiguous, or otherwise unclear. The only aspect of the appellee's statement that was tentative was whether he would in fact be willing to 'give up' any of his *Miranda* rights. What was absolutely crystal clear about his statement was that he did not desire to do so (or to be pressured by the police to do so) in the absence of counsel. It was more than sufficient to alert the interrogating officers that if they desired to speak with the appellee further, in an attempt to persuade him to waive any of the other rights that *Miranda* confers upon him, then they must first afford him the right to have counsel present during that attempt. Before they could

28

take advantage of the appellee's apparent amenability to talk, and thereby forego his constitutional right to stand mute, the interrogating officers were obliged to abide by his clearly stated condition . . . .

*Id.* at 893–94.

In contrast, in *Davis v State*, the court of criminal appeals found that a suspect's statement, "I should have an attorney" was not a clear invocation of his right to counsel. 313 S.W.3d at 341. The court reasoned that this statement "was not in the form of a request, nor did appellant expressly say that he wanted a lawyer." *Id.* Moreover, Texas courts have held that suspects' questions regarding their rights to counsel that do not affirmatively communicate a request to consult with an attorney are not clear invocations of the suspect's right to counsel. *See Mbugua v. State*, 312 S.W.3d 657, 665 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (holding that a suspect did not invoke his right to counsel when he asked, "Can I have him present now?" after he was informed of his right to an attorney); *Gutierrez v. State,* 150 S.W.3d 827, 832 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding that a suspect did not invoke his right to counsel when he asked, "Can I wait until my lawyer gets here?").

## B. Discussion

As an initial matter, we agree with the State that Alcala did not unambiguously request an attorney when he asked Investigator Vasquez, "Should I have an attorney?" Texas case law clarifies that such a question is not sufficiently clear to demonstrate that a suspect is invoking his right to an attorney. *See Davis*, 313 S.W.3d at 341; *Mbugua*, 312 S.W.3d at 665; *Gutierrez*, 150 S.W.3d at 832. However, immediately following Alcala's question, Investigator Vasquez asked Alcala, "Do you want an attorney, or do you want to consult an attorney, or what is it that you want to do?" Appellant responded,

29

"Yeah. Cause I mean, I'm not aware of what you just told me that—my son said—I don't—[inaudible due to overlapping voices]." Alcala's statement was an unambiguous, affirmative response to Investigator Vasquez's question asking if he wanted an attorney and was therefore a clear invocation of his right to consult with counsel. *See Smith*, 469 U.S. at 96.

The State argues that the last part of Investigator Vasquez's compound question, "what is it you want to do?" was the question that elicited the response, "yeah." However, we conclude that this is not a reasonable interpretation of the statement because "what is it you want to do?" is not a "yes or no" question. Moreover, under the totality of the circumstances, the context of Alcala's statements further indicates that, by responding in the affirmative, he was clearly requesting to invoke his right to consult with an attorney. *Davis*, 313 S.W.3d at 341 (explaining that "courts have suggested that surrounding circumstances were highly relevant considerations"). While Alcala's initial question, "should I have an attorney" was not a clear invocation of his right to counsel, it does indicate that he initiated the discussion regarding his right to counsel; Alcala therefore likely understood Investigator Vasquez's question and was interested in invoking his right to counsel even before it was asked.

In addition, immediately after responding, "yeah," Alcala stated, "Cause I mean, I'm not aware of what you just told me that—my son said—I don't—[inaudible due to overlapping voices]." Appellant appeared to be attempting to explain why he wanted an attorney, but Investigator Vasquez interrupted him before he completed his statement. At the hearing on the motion to suppress, Investigator Vasquez explained that he continued speaking to Alcala because, "He says that he was not aware of what I had just told him.

30

So I continued to explain to him what I was talking about." Alcala's statement indicated that he wanted an attorney because he was not aware of the circumstances of the crime or of what his son had said about him, as was revealed shortly thereafter when he stated, "that's what I don't understand" in response to Investigator Vasquez's claim that "your son is blaming you for some of those things that I said happened." Alcala's explanation for invoking his right to counsel neither indicated that he was unable to understand the investigator's question, nor rendered his affirmative response to Investigator Vasquez's question ambiguous.

Further, while we agree with the State's contention that, "It is beyond reasonable dispute that [Alcala] was advised of, and understood his rights" before the interrogation continued, the investigating officer was required to cease the interrogation until counsel was provided or Alcala initiated further conversation. *See Smith*, 469 US at 93. It is undisputed that Alcala's subsequent statements, like in *Smith* and *Gobert,* were made in response to Investigator Vasquez's prompting.[7] *See Id.* at 93; *Gobert*, 275 S.W.3d at 894–95 (determining that the appellant did not waive his right to counsel when immediately after he clearly invoked right to counsel, he told the police that he was willing to talk to them in response to their questions, "you don't want to talk?" and "you don't want to talk to us?"). Here, no counsel was provided before Investigator Vasquez further explained the circumstances of the alleged murder and continued to ask Alcala if he wanted to proceed with the interrogation. Because, given the totality of the circumstances, we find that Alcala issued an unambiguous affirmative response when

_____

[7] On appeal, the State does not argue that Alcala initiated any further conversation. Moreover, at oral argument, it conceded that Alcala's subsequent statements would not render a clear invocation of Alcala's right to an attorney invalid.

31

Investigator Vasquez asked him if he wanted to consult with an attorney, we conclude that his Fifth Amendment right to counsel was violated when the investigator continued the interrogation. *See Edwards*, 451 U.S. at 484–85; *Davis*, 313 S.W.3d at 339.

### C. Harm

The admission of evidence in violation of a defendant's Fifth Amendment right to counsel is subject to harm analysis. *Ramos v. State*, 245 S.W.3d 410, 419 (Tex. Crim. App. 2008). However, because it is constitutional error, we can find the error harmless only if we conclude, beyond a reasonable doubt, that it did not contribute to the conviction or punishment. *See* TEX. R. APP. P. 44.2(a).

In determining whether constitutional error in the admission of evidence is harmless, we consider several factors, including the following: the importance of the evidence to the State's case; whether the evidence was cumulative of other evidence; the presence or absence of other evidence corroborating or contradicting the evidence on material points; the overall strength of the State's case; and any other factor, as revealed by the record, that may shed light on the probable impact of the error on the mind of the average juror. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). In addition, we may consider: the source and nature of the error; the emphasis placed upon the evidence by the State; the weight a juror may have placed on the evidence; and whether finding the error harmless would encourage the State to repeat the conduct. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).

In *McCarthy v. State*, the court of criminal appeals held that the admission of a defendant's statement in violation of her constitutional rights was not harmless error even though it found "that the State offered ample evidence of [the defendant's] guilt from

sources independent of her statement." 65 S.W.3d 47, 52 (Tex. Crim. App. 2001).   In

*McCarthy*, the defendant did not confess to the crime during her statement, but "the State

relied on appellant's statement extensively, both during its case-in-chief and during its

closing arguments." *Id.*  The court reasoned that at closing arguments, the "inadmissible

statements became the rhetorical strawman that the State effectively decimated." *Id.* at

53.   Ultimately, the court determined that it could not "conclude, beyond a reasonable

doubt, that the admission of appellant's unconstitutionally obtained statement did not

contribute to the jury's verdict of guilty." *Id.* at 56.

To begin our analysis in the present case, we consider the emphasis placed by the

State on the inadmissible statement, whether the information obtained during the

statement was cumulative of other evidence, and the overall importance of the statement

to the State's case. *Clay*, 240 S.W.3d at 904.  Here, like in *McCarthy*, the State relied on

the erroneously admitted statement to prove Alcala's guilt.  *See* 65 S.W.3d at 52.  The

State played the video of Alcala's interrogation for the jury, and Investigator Perez testified

extensively regarding inconsistencies in Alcala's statements.   He explained that these

inconsistencies led him to be suspicious that Alcala was responsible for the murders.

Perez also testified that Alcala provided unreasonable explanations for his actions after

the murders were committed.

During its closing argument, the State emphasized its assertion that the

inconsistencies in appellant's statement proved his guilt[8]:

---

[8] Notably, the State relies, in part, on Alcala's statements during the interrogation to support its argument that the evidence was sufficient to support Alcala's conviction.  In its appellate brief, the State directs us to the  following inconsistencies in Alcala's statement that it asserts "defy logic and common sense":  (1) Alcala's assertion that he had been shooting a firearm not suitable for hunting in preparation to hunt deer; (2) Alcala's initially claim that the officers could find spent casing at the location to verify that he had been shooting, followed by his explanation that they could not be found because he had thrown the spent casing in a canal; (3) Alcala's statement that he had returned home before gunshot fire was heard

33

> You heard the statement. And the statement that was given voluntarily, the statement was given after his warnings were read to him. You saw that. He gave that statement willingly. And now, as far as that statement is concerned, there are a lot of inconsistencies and those inconsistencies were actually pointed out by Investigator Perez but you can see them yourself, and I ask you to remember, in that interview, he said that rifle was not used. That rifle was not used.

The State expressly referred to Alcala changing his story, asserting that it was evidence that he was not telling the truth during the interrogation. As explained in our sufficiency review, the jury was entitled to regard any statements they found inconsistent as evidence of appellant's guilt. *See Wilson*, 162 U.S. at, 621; *Hacker*, 389 S.W.3d at 872.

Moreover, during the interrogation, Alcala admitted that he brought a gun with him when he drove his son to look for David Garcia. This was the only evidence presented by the State to show that Alcala brought a gun with him on the night of the murders, and the State used it to create an inference that he intended to use it. The State also referred to Alcala's statements about the gun during closing arguments:

> At first he says he didn't take a firearm. Later on in his interview he admits, Yes, I did take a firearm. But what firearm did he say he took. The .40 caliber rifle. Oh, I took it for protection, because he is going to go and reason with the family that time of the early morning.

The State derided appellant's explanation for his actions on the night of the murder and, like in *McCarthy*, the "inadmissible statements became the rhetorical strawman that the State effectively decimated." *See* 65 S.W.3d at 53. More importantly, the State relied on this vital information obtained from Alcala's statement to suggest that because Alcala brought a gun to confront the victims, he intended to commit the murders.

---

was contradicted by other witnesses; and (4) Alcala's claim that he didn't hear the gunshots, "despite their being loud enough to be heard by his neighbor and by the patrolling police officer." The State also contends Alcala's admission that he brought a gun when he spoke with Marisela Garcia was evidence supporting the jury's finding of guilt.

Regardless, without disputing the emphasis it placed on the interrogation or the importance of the information obtained from Alcala's statements, the State argues that "other evidence of [Alcala's] guilt was so overwhelming as to render any error in admitting his statements to be harmless." We disagree.

The court of criminal appeals in *Wesbrook v. State* explained the role of the totality of the State's evidence in our harmless error review as follows:

> An appellate court should not focus on the propriety of the outcome of the trial. Instead, the appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence. While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. If an appellate court rules that an error is harmless, it is in essence asserting that the nature of the error is such that it could not have affected the jury. Stated in an interrogatory context, a reviewing court asks if there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question.

29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (en banc) (citations omitted).

In other words, as the United States Supreme Court has clarified, we do not premise our harm analysis for constitutional error on an examination of whether the State presented sufficient evidence, absent the erroneously admitted statement, for a rational jury to find the defendant guilty. *Satterwhite v. Texas*, 486 U.S. 249, 258–59 (1988) ("The question, however, is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"); *see also Brooks v. State*, 132 S.W.3d 702, 708 (Tex. App.—Dallas 2004, pet. ref'd) ("The fact that the legally admitted evidence is sufficient to support the verdict does not demonstrate the error was harmless."). Instead, we must consider whether such

evidence was overwhelming as a factor in our ultimate determination of whether the erroneously admitted evidence "could not have affected the jury." *See Wesbrook*, 29 S.W.3d at 119; *see also Garcia v. State*, No. 04-08-00677-CR, 2010 WL 816202, *5 (Tex. App.—San Antonio Mar. 10, 2010, no pet.) (mem. op., not designated for publication) (determining that the admission of a defendant's confession was harmless error when multiple witnesses testified they had observed the defendant aim and fire a gun at [the victim's] vehicle and where at least two of these witnesses expressly testified they "got a really good look at" the defendant or remembered his face "perfectly").

In the present case, the State relied on circumstantial evidence to prove Alcala's guilt. There were no eye-witnesses, there was no evidence of violent threats made by Alcala, a murder weapon was never recovered, and the State argued that the evidence it presented indicated that two people, both Alcala and his son, were present at the scene of the crime and could have committed the murders. Especially given the emphasis placed on the interrogation video and the importance of the information obtained from Alcala's statement to the State's case, we conclude that other circumstantial evidence indicating Alcala's guilt was not sufficiently overwhelming for us to determine, beyond a reasonable doubt, that the erroneous admission of Alcala's statement did not contribute to the jury's verdict. *See* TEX. R. APP. P. 44.2(a). Accordingly, we sustain Alcala's second issue.[9]

---

[9] Because we have determined that the trial court's judgment must be reversed and are remanding this case for a new trial based on Alcala's second issue, we decline to address Alcala's third issue, whether the trial court erred by denying his motion to suppress evidence obtained from an illegal search of his house. *See* TEX. R. APP. P 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). At a new trial, the trial court must make a new determination on any new objection or motion seeking to suppress evidence. *See id.* 21.9(b) ("Granting a new trial restores the case to its position before the former trial, including, at any party's option, arraignment or pretrial proceedings initiated by that party.").

## IV.    CONCLUSION

We reverse the judgment of the trial court and remand for a new trial.


ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
24th day of July, 2014.