

## NUMBER 13-18-00323-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

BRUNO RICARDO
MONTALVO CHAPA,                                                        Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

**On appeal from the 370th District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION
**Before Justices Benavides, Hinojosa, and Perkes
Memorandum Opinion by Justice Benavides**

Appellant Bruno Ricardo Montalvo Chapa appeals his conviction for two counts of continuous sexual abuse of a child, first-degree felonies. *See* TEX. PENAL CODE ANN. § 21.02. Chapa argues that the trial court abused its discretion by admitting: (1) evidence that co-defendant Maria Luisa Olivarez filed a police report over damaged furniture; and (2) the partial audio recording of Olivarez's out-of-court conversation with

Alma De Santiago. By his third issue, Chapa argues that the trial court erred when it overruled his objection to the State's closing argument outside the record. Olivarez and Chapa were tried together. We affirm.

## I.  BACKGROUND

Chapa and Olivarez were in a relationship for approximately seven years. Olivarez has two daughters, G.D.S. and C.D.S., who were born in 2005 and 2006.[1] Chapa was convicted of the continuous sexual abuse of G.D.S. and C.D.S. Olivarez and the girls' father Jose Luis De Santiago were divorced in 2009. De Santiago later married Alma De Santiago in 2013.

Alma testified at trial that Jose did not see his daughters often and she encouraged him to develop a closer relationship with them. She telephoned Olivarez and began talking to her and over time, G.D.S. and C.D.S began spending every other weekend, and then more often, with Jose and Alma.

On February 15, 2016, the De Santiago family was celebrating C.D.S.'s ninth birthday at a local restaurant. The girls went to the restroom with Alma and while there, C.D.S. confided in Alma that Chapa touched her inappropriately. G.D.S., who was ten, left the restroom and did not say anything. Later that afternoon, Alma told Jose what C.D.S. told her. They telephoned the Pharr police department who referred them to the Police Department in McAllen where the girls lived with Olivarez. They also spoke to the Hidalgo County Sheriff's Office (HCSO). Jose telephoned Olivarez to tell her about C.D.S.'s allegations.

---

[1] We use initials to protect the identities of the minors. *See* TEX. R. APP. P. 9.7.

Alma met with Olivarez on February 18, 2016, to prepare a notarized letter to allow the girls to stay with her and to transfer their medical and other benefits to Alma and Jose. It was during that meeting that Alma recorded a portion of their conversation. During that conversation Olivarez admitted that G.D.S. told her that Chapa was molesting her and she confronted Chapa. According to the transcription of Olivarez, Chapa responded, "What do you mean molesting? . . . no, I'm not doing anything to the girl." Olivarez responded, "Okay, I told him, you know what? this is over." During the conversation, Alma accused Olivarez of knowing about the abuse. Olivarez responded, "I know what's coming is very heavy—there's things coming—I know there's heavier things coming for me. Maybe I'll go—maybe I'll spend time locked up too, I don't know." When Olivarez insisted that she was broken up with Chapa, Alma insisted that she had taken the girls to him the previous Friday, to which Olivarez responded, "I'm telling you the truth. I haven't taken the little girls. . . . On Friday I didn't take the girls to him." Olivarez's mother was also involved in the conversation but died before trial.

Investigator Steve Moyar with the HCSO testified at trial that he was assigned to investigate the allegations on February 16, 2016. He observed the girls' interviews which took place on February 24, 2016 at the children's advocacy center and scheduled the sexual assault examinations for the same day. During the interviews, one of the girls described an event during which their mother kept them in a bedroom at Chapa's apartment on Owassa Road when the police came regarding furniture damaged during delivery to prevent them from talking to the police about the abuse. Investigator Moyar found a report that Olivarez made of furniture damaged during delivery at that address.

3

On February 27, 2016, Alma provided him with a recorded conversation she made on February 18, 2016 with Olivarez.

Investigator Israel Hernandez with the HCSO testified that in late December 2013 he took a call from Olivarez about furniture that had been damaged during delivery at an apartment on Owassa Road. Hernandez went inside the apartment and Olivarez appeared to be the only one home. Olivarez stated she was living at the apartment.

Evonne Garcia, R.N., testified at trial that she performed examinations on both G.D.S. and C.D.S. She holds a bachelor's degree in nursing and is certified as a pediatric sexual assault nurse examiner. She has performed over 2,000 sexual assault examinations. When she performed her examination on G.D.S., G.D.S. reported the last time Chapa touched her vagina was on February 13th, nine days earlier. As a result, Garcia did not attempt to obtain DNA because the protocol is to look for DNA within a 96 hour window from the last event.

G.D.S. was ten years' old at the time of her examination by Garcia. G.D.S. reported that Chapa touched her using his fingers in her "private parts" and "licked it" pointing to her female sexual organs and described vaginal penetration by Chapa's finger and tongue. She also stated, "My mom takes me to his apartment." G.D.S. further stated, "he touched my chest," sometimes with her clothes on, sometimes with them off. G.D.S. stated he touched her "a lot of times." During her examination of G.D.S., Garcia noted that G.D.S. had: two bruises, one on her upper right thigh, and one on her inner right thigh. Garcia further noted that G.D.S. had: a small tear to her labial commissure, and redness to the vestibular area, the labia minora, to her hymen, down to the anal area,

4

and the perineum.   G.D.S. also had a urinary tract infection (UTI).   According to Garcia, G.D.S.'s UTI could result from sexual assault or other causes, or the UTI could have caused some of the redness in her genital area, but a UTI would be very unlikely to cause the redness to the hymen.   The tear to the anterior labial commissure could have been caused by sexual assault or by G.D.S. scratching from irritation from the UTI.

Garcia testified that she also examined C.D.S., who was nine at the time of the examination.   Garcia testified regarding the history she took from C.D.S.   C.D.S. told Garcia that Chapa touched her "sapo" and pointed to her female sexual organ; he put his finger in her "sapo" and in her butt more than four times starting when she was in the first grade; he also touched her chest.   C.D.S. reported that when Chapa touched her, her clothes were off, his clothes were off, and he touched her with his hands.   According to Garcia, C.D.S. told her that Chapa made her touch him in his "sapo" too.   C.D.S. was scared because he told her that if she said anything, he would kill her.   Chapa most recently touched her on February 13, 2016.   C.D.S. told Garcia that he touched her in front of her mother and also when her mother was not there.   C.D.S. described a time when Chapa locked the girls up in a bedroom when the police came so they would not tell the police what happened.   The only physical finding Garcia noted was immediate anal dilation when Garcia spread C.D.S.'s buttocks.   That finding can occur in a child who is chronically constipated, but Garcia will usually see stool present and she did not. Immediate anal dilation can also result from regular anal penetration.

Chapa testified that he did not touch either girl inappropriately and that he was never alone with either of them.   He further testified that he rarely saw them because he

5

often worked out of town.

Olivarez testified that she and her daughters were very close, and they lived with her parents before and after her divorce. She and her daughters visited Chapa when he lived in the apartment on Owassa Road and sometimes spent the night. According to Olivarez, Alma befriended her and she did not know that Alma married her former husband Jose. Olivarez testified she let Alma take her girls for weekends to socialize with Alma's children. Olivarez further testified that G.D.S. told her at one time that Chapa molested her and Olivarez responded, "what bother?" She believed Chapa must have reprimanded G.D.S. and G.D.S. did not explain further. According to Olivarez, she stopped seeing Chapa although she did not believe G.D.S. meant anything sexual. Olivarez denied at trial that she knew that Chapa touched the girls sexually, although when Alma and she discussed things in 2016, Olivarez told Alma that she had already taken care of it, referring to the girls' reports of abuse. Olivarez testified at trial that she was back in a relationship with Chapa and they drove to and from court together but they did not live together. Olivarez also denied that she ever left the girls alone at the apartment when Chapa was there, although she admitted she might have napped or showered while the four of them were at the apartment.

The jury found Chapa guilty on both counts of the indictment of continuous sexual abuse of a child. *See* TEX. PENAL CODE ANN. § 21.02. After the punishment hearing, the jury assessed punishment at forty years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice on each count and the trial court ordered concurrent sentences. Chapa appealed.

## II. ADMISSION OF EVIDENCE

### A. Standard of Review

We review a trial court's rulings on the admission of evidence for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Martinez v. State*, 527 S.W.3d 310, 325 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. *De La Paz*, 279 S.W.3d at 343–44.

### B. Evidence of a Police Report in December 2013

Chapa's first issue on appeal challenges the trial court's admission of evidence that Olivarez made a police report regarding damaged furniture. He complains that it was an extraneous act that was not timely disclosed. Before Investigators Moyar and Hernandez testified regarding Oliverez's report, defense counsel for Olivarez objected on the grounds that the report constituted extraneous conduct that was not properly disclosed and that the police report was hearsay. Chapa's counsel did not object before Moyar or Hernandez testified. He therefore did not preserve error as to that evidence. *See* TEX. R. APP. P. 33.1(a)(1); *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) (failing to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence); *see Martinez v. State*, 833 S.W.2d 188, 191 (Tex. App.—Dallas 1992, pet. ref'd) (holding that appellant failed to preserve error because he did not join in his co-defendant's objection).

We overrule Chapa's first issue.

7

## C.    Audio-recording of Olivarez's Conversation

By his second issue, Chapa argues that the trial court abused its discretion by admitting the audio recording and transcript of a portion of a conversation between Alma and Olivarez from February 15, 2015.   Before the jury heard the audio-recording of the conversation between Olivarez and Alma, the audio was redacted to remove portions of the audio by Olivarez's mother who died before trial.   The recording was also transcribed and translated from Spanish into English.   Before the exhibits were offered, Olivarez's counsel objected on grounds of hearsay, the best evidence rule, and bolstering.   *See* TEX. R. EVID. 802, 1002.   Chapa's counsel joined in those objections.

By his second issue on appeal, Chapa argues that because the recording was incomplete, it was necessarily misleading.   He further argues that because Olivarez's mother was deceased, he had no opportunity to cross-examine her, and because a portion of the conversation is unavailable for context, he cites to the rule of optional completeness.   *See* TEX. R. EVID. 107.   Chapa argues on appeal that his inability to cross-examine Oliverez's mother, combined with the incompleteness of the recording created a false impression before the jury from which he could not recover.   However, Chapa did not object on those bases at trial.   His objection piggybacked his co-defendant's objection on the grounds of hearsay, bolstering, and the best evidence rule. As a result, because Chapa's objection at trial does not substantially comport with his objection on appeal, he failed to preserve his objection to this evidence.   *See* TEX. R. APP. P. 33.1(a)(1); *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999) (failing to object on the same ground on appeal as at trial waives appellate review); *Alcala v. State*,

8

476 S.W.3d 1, 25 (Tex. App.—Corpus Christi–Edinburg 2013, pet. ref'd) ("Therefore, because counsel's objection at trial does not comport with the issue raised on appeal, the error, if any, was waived.").

We overrule Chapa's second issue.

### III.   JURY ARGUMENT

By his third issue, Chapa argues that the State's closing argument was outside the record, he timely objected, the trial court overruled his objection, which violated his Fifth Amendment right to due process and his Sixth Amendment right to confrontation.   *See* U.S. CONST. amends. V, VI.

During closing, the State referenced the audio-recording between Alma and Olivarez.  The State explained that the voice of Olivarez's mother is missing and then said: "So, when you hear the silence—that's [Olivarez's] mommy.  And guess what— She's mad.  She's mad."  Counsel for Olivarez objected that the argument was outside the record, but Chapa's counsel did not.

"[A] defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal."  *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996); *Benn v. State*, 110 S.W.3d 645, 650 (Tex. App.—Corpus Christi—Edinburg 2003, no pet.).  Again, Chapa failed to preserve the error, if any, for review on appeal.  *See* TEX. R. APP. P. 33.1(a)(1).  Although a defendant may adopt a co-defendant's objection, he must do so on the record.  *See Woerner v. State*, 576 S.W.2d 85, (Tex. Crim. App. 1979); *Uyamadu v. State*, 359 S.W.2d 753, 767–68 (Tex. App.—Houston [14th Dist.

9

2011, pet. ref'd) (failing to indicate adoption of objection on the record fails to preserve error for review); *see also McClure v. State,* No. 13–13–00248–CR, 2014 WL 3804445, * (Tex. App.—Corpus Christi–Edinburg July 341, 2014, pet. dism'd) (mem. op., not designated for publication) (holding appellant failed to preserve objection by failing to join co-defendant's objection to State's closing argument).

We overrule Chapa's third issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
22nd day of August, 2019.